**Reversed and Remanded and Opinion filed February 14, 2012.**



**In The**

# Fourteenth Court of Appeals

———————————

## NO. 14-10-01099-CV

———————————

**WILLIAM T. DRENNEN III, Appellant**

**V.**

**EXXON MOBIL CORPORATION, Appellee**

---

**On Appeal from the 129th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2008-27303**

---

# OPINION

Appellant William T. Drennen III appeals from the trial court's denial of his motion for judgment notwithstanding the verdict[1] and the trial court's subsequent entry of a take-nothing judgment in favor of appellee Exxon Mobil Corporation ("ExxonMobil").[2] We reverse and remand.

---

[1] The full title of Drennen's motion is "Motion for Judgment Notwithstanding the Verdict, to Disregard Jury Verdict, and for a Judgment that ExxonMobil's Incentive Plans are Covenants Not to Compete Under Texas Law and are Unenforceable as a Matter of Law."

[2] For purposes of consistency, we shall refer to appellee as ExxonMobil except where directly quoting from a document or trial testimony.

# I. FACTUAL AND PROCEDURAL BACKGROUND

ExxonMobil is a New Jersey corporation with its corporate headquarters in Dallas, Texas. Drennen worked for ExxonMobil, primarily in Texas, for over 31 years. He started as a geologist in 1976 and retired in 2007 as Exploration Vice President – Americas, working at ExxonMobil Exploration Company in Houston, Texas. In that position, Drennen was in charge of ExxonMobil's exploration activities in the Western Hemisphere.

Over the years, Drennen was awarded incentive compensation, including awards of restricted stock and "earnings-bonus units."[3] Drennen could not sell, transfer, pledge, or assign the restricted shares until the restricted period came to end. During the restricted period, the shares of restricted stock were registered in Drennen's name, and Drennen had all of the customary rights of a shareholder, including rights to receive dividends and vote the shares. Earnings-bonus units entitled the recipient to a cash payout from ExxonMobil if the cumulative earnings per share of ExxonMobil's stock reached a designated level.

Drennen's incentive compensation was part of ExxonMobil's Incentive Programs,[4] which were created to reward high-performing employees and dissuade high-achieving executive-level employees from leaving ExxonMobil to work for competitors. The Incentive Programs include provisions allowing ExxonMobil to cancel the incentive awards of employees who engage in "detrimental activity." The 1993 Incentive Program defines "detrimental activity" as "activity that is determined in individual cases by the administrative authority to be detrimental to the interests of the Corporation or any affiliate." The "administrative authority" consists of ExxonMobil's chairman of the board or the chairman's delegates. The 2003 Incentive Program defines "detrimental activity" to include

---

[3] In the record, the word *earnings* appears in this phrase in both the singular and plural form. Because these awards were tied to ExxonMobil's earnings, we have used the plural form.

[4] Drennen participated in two of ExxonMobil's Incentive Programs: the Exxon Corporation 1993 Incentive Program and the Exxon Mobil Corporation 2003 Incentive Program. For all practical purposes, the two programs are identical, and we will refer to them collectively as the "Incentive Programs."

activity at any time, during or after employment with the Corporation . . . that is determined in individual cases by the administrative authority to be . . . (d) acceptance by grantee of duties to a third party under circumstances that create a material conflict of interest, or the appearance of a conflict of interest, with respect to the grantee's retention of outstanding awards under the [Incentive] Program . . . . . With respect to material conflict of interest or the appearance of material conflict of interest, such conflict might occur when . . . a grantee holding an outstanding award becomes employed or otherwise engaged by an entity that regulates, deals with, or competes with the Corporation . . . .

The Incentive Programs include choice-of-law clauses providing that the Programs are governed by New York law; however, the Programs' terms also include exceptions for employees who are foreign nationals. Under this exception, the administrative authority is authorized to "establish different terms and conditions for awards to persons who are residents or nationals of countries other than the United States in order to accommodate the local laws, tax policies, or customs of such countries."[5] Each time Drennen received restricted stock, he was required to sign a restricted-stock agreement that adopted the terms of the Incentive Programs. The parties signed each of these restricted-stock agreements in Texas. During his employment, Drennen was awarded a total of 73,900 shares of restricted stock.

In December 2006, Drennen and his supervisor Tim Cejka met for Drennen's annual review. At the time, Cejka was president of ExxonMobil Exploration Company and a vice president of Exxon Mobil Corporation. Cejka said that Drennen's performance had suffered and he could no longer continue overseeing ExxonMobil's exploration activities in the Western Hemisphere. Cejka also informed Drennen that ExxonMobil wanted to find another position for him within the company. As a result of this conversation, Drennen submitted his letter of retirement to ExxonMobil on March 12,

---

[5] The quoted portion above is from the 2003 Incentive Program. The 1993 Incentive Program provides that the administrative authority can change the administration of the Incentive Program as it applies to foreign nationals as it "may in its judgment be necessary or desirable to foster and promote achievement of the purposes of this Program."

3

2007. Drennen announced he would retire on May 1, 2007 and he actually retired from ExxonMobil's employ on May 2, 2007.

On April 23, 2007, ExxonMobil sent Drennen a letter informing him as follows:

Your obligations respecting ExxonMobil's confidential information are not limited in time or to specific business contexts. However, our experience indicates that problems and misunderstandings are most likely to arise in the context of work with other organizations within a few years of retirement, particularly work with organizations in the same business as ExxonMobil or organizations that have significant ongoing relationships with ExxonMobil.

Normally, especially with advance notice, we are able to resolve potential conflicts in ways that protect and accommodate everyone's interests. Accordingly, we request that for two years after your retirement from ExxonMobil Exploration Company you notify senior management at ExxonMobil before you take a position with, or perform services for, another organization in the petroleum or petrochemical industry or any organization that has a significant ongoing relationship with ExxonMobil.

Drennen interviewed for a position with Hess Corporation, a global, integrated energy company engaged in the exploration, production, purchase, transportation, and sale of crude oil and natural gas, as well as the production and sale of refined petroleum products. In early May 2007, Drennen informed Cejka that he was considering taking a position with Hess. Cejka telephoned Drennen on May 15, 2007, and warned Drennen that if he accepted a position with Hess, "it would be highly likely that [Drennen] would lose all [of his] incentives." Drennen nevertheless accepted a position as senior vice president of global exploration and new ventures and began working for Hess on July 2, 2007.

On August 1, 2007, Cejka wrote Drennen that ExxonMobil was canceling all of his incentive awards because he had gone to work for Hess.[6] Drennen responded by suing

---

[6] Cejka wrote as follows:

At a minimum, the duties that you have accepted at Hess create a material conflict of interest and the appearance of a material conflict of interest with respect to your retention of your outstanding awards under Exxon Mobil Corporation's incentive programs. Accordingly, the administrative authority of those programs has determined that your

4

ExxonMobil to prevent enforcement of the detrimental-activity provisions.[7] As relevant to this appeal, Drennen sought declarations that (a) the detrimental-activity provisions in the Incentive Programs were utilized by ExxonMobil as a covenant not to compete; (b) the detrimental-activity provisions are unenforceable because they are not limited as to time, geographic area, or scope of activity; and (c) ExxonMobil's cancelation of his incentive awards is an impermissible attempt to recover monetary damages for an alleged breach of an unenforceable covenant not to compete. Although other issues were submitted to a jury, the parties agreed that the trial court would decide the declaratory-judgment issues.

At the conclusion of the evidence, the trial court submitted questions to the jury based on Drennen's breach of contract, oral modification, waiver, and estoppel causes of action. The jury answered each of these questions against Drennen. Drennen then moved unsuccessfully for judgment notwithstanding the verdict based on his declaratory-judgment cause of action. This appeal followed.

## II. DISCUSSION

On appeal, Drennen does not challenge the jury's verdict against him. Instead, Drennen asserts that the trial court erred in denying his motion for judgment notwithstanding the verdict. In a single issue, Drennen argues on appeal that the detrimental-activity clauses are covenants not to compete and are void under Texas law. As previously mentioned, however, the Incentive Programs contain choice-of-law clauses specifying that New York law applies. Thus, Drennan's single appellate issue actually

---

conduct constitutes detrimental activity within the meaning of those programs and all of your outstanding awards — a total of 57,200 restricted shares of Exxon Mobil Corporation and 33,722 Earnings Bonus Units — have been forfeited and cancelled.

[7] Drennen also alleged that Cejka was a vice-principal of ExxonMobil and had orally modified the detrimental-activity provisions so that Drennan's work for other employers would not be considered detrimental to ExxonMobil unless Drennen worked for one of four specifically designated companies. Drennen further argued that as a result of this alleged modification, ExxonMobil waived or was estopped from enforcing any right it otherwise might have had to treat Drennen's employment by Hess as a detrimental activity justifying cancelation of Drennen's incentive awards. Drennen additionally asserted a breach-of-contract cause of action.

5

raises at least two interrelated questions: are the detrimental-activity clauses noncompetition provisions? And are they enforceable under the laws of Texas and New York? If the laws of the two states differ, then we also must answer a third question: which state's laws apply to this dispute between ExxonMobil and Drennen? Drennen contends that Texas law applies, and in the Covenants Not to Compete Act, the Texas legislature restricted the enforceability of noncompetition agreements. *See* TEX. BUS. & COM. CODE ANN. § 15.50(a) (West 2011). In Texas, covenants not to compete are enforceable only if, among other things, they contain reasonable limitations as to the time, time, geographical area, and scope of activity to be restrained. *Id.* Such limitations must not impose greater restraints than necessary to protect the goodwill or other business interest of the promisee. *Id.* Although it is undisputed that the detrimental-activity provisions contain no such restrictions, ExxonMobil contends that the provisions are enforceable either because they are not covenants not to compete, or because New York law applies.

## A.    Standard of Review

A trial court may disregard a jury's findings and render judgment notwithstanding the verdict if no evidence supports the jury's findings, or if a directed verdict would have been proper. *Tiller v. McLure*, 121 S.W.3d 709, 713 (Tex. 2003) (per curiam). To determine whether a movant was entitled to judgment notwithstanding the verdict, we apply the same standard that governs legal-sufficiency review. *See Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005). A legal-sufficiency point must be sustained when (1) there is a complete absence of evidence of a vital fact; (2) rules of law or evidence preclude the factfinder from giving any weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla; or (4) the evidence conclusively establishes the opposite of the vital fact. *Id.* at 810. Because judgment against the jury's verdict is proper if "the law does not allow reasonable jurors to decide otherwise," *id.* at 823, a trial court should grant a motion for judgment notwithstanding the

6

verdict if a legal principle prevents a party from prevailing on its claim. *United Parcel Serv., Inc. v. Tasdemiroglu*, 25 S.W.3d 914, 916 (Tex. App.—Houston [14th Dist.] 2000, pet. denied). Thus, in reviewing the denial of a motion for judgment notwithstanding the verdict, appellate courts consider whether the movant is entitled to judgment as a matter of law. *OXY USA, Inc. v. Cook,* 127 S.W.3d 16, 19 (Tex. App.—Tyler 2003, pet. denied). When the trial court's ruling is based on a question of law, we review that aspect of the ruling de novo. *See In re Humphreys*, 880 S.W.2d 402, 404 (Tex. 1994) (stating that questions of law are always subject to de novo review); *see also Hicks v. Hicks*, 348 S.W3d 281, 284 (Tex. App.—Houston [14th Dist.] 2011, no pet.) (same).

Here, Drennen's motion for judgment notwithstanding the verdict was concerned exclusively with questions of law. The determination of which state's law governs is a question of law for the court to decide. *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 848 (Tex. 2000); *Minn. Mining & Mfg. Co. v. Niskita, Ltd.*, 955 S.W.2d 853, 856 (Tex. 1996). Under de novo review, the reviewing court exercises its own judgment and re-determines each legal issue. *Quick v. City of Austin*, 7 S.W.3d 109, 116 (Tex. 1998). The enforceability of a covenant not to compete likewise is a question of law, and thus, subject to de novo review. *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 682 (Tex. 1990); *Curtis v. Ziff Energy Grp., Ltd.*, 12 S.W.3d 114, 118 (Tex. App.—Houston [14th Dist.] 1999, no pet.).

**B.     Do the laws of New York and Texas differ in the treatment of the detrimental-activity provisions?**

The issue of whether the laws of New York or of Texas govern the detrimental-activity provisions is significant only if the laws of the two states differ. *See Duncan v. Cessna Aircraft Co.,* 665 S.W.2d 414, 419 (Tex. 1984). We therefore begin by examining whether the two states differ on the questions of whether agreements such as the detrimental-activity provisions are covenants not to compete and whether the provisions are enforceable.

7

### 1. New York

Under New York law, non-competition clauses in employment contracts are not favored and will only be enforced to the extent reasonable and necessary to protect valid business interests. *Morris v. Schroder Capital Mgmt. Int'l*, 859 N.E.2d 503, 506 (N.Y. 2006). New York recognizes the employee-choice doctrine as an exception to the general disfavor of non-competition provisions. *Id.* This exception applies in cases in which an employer conditions receipt of post-employment benefits upon compliance with a restrictive covenant. *Id.* The doctrine rests upon the premise that an employee's liberty to earn a living is not unreasonably restrained if the employee is free to choose between preserving his rights under the employment contract by refraining from competition and risking forfeiture of such rights by exercising his right to compete. *Id.* Under New York law, it is assumed that an employee who leaves his employer makes an informed choice between these alternatives. *Id.* We therefore conclude that under New York law, the detrimental-activity provisions are covenants not to compete and are enforceable under the employee-choice doctrine.

### 2. Texas

In Texas, covenants that place limits on former employees' professional mobility are restraints on trade and are governed by the Covenants Not to Compete Act. *Marsh USA, Inc. v. Cook*, 55 Tex. Sup. Ct. J. 184, 185, 2011 WL 6378834, at *2 (Tex. Dec. 16, 2011). These covenants are unenforceable on grounds of public policy unless they are reasonable. *DeSantis*, 793 S.W.2d at 681. This rule also applies to agreements that do not expressly prohibit a former employee from competing, but instead impose a severe economic penalty on the departing employee if he engages in competition. *See Peat Marwick Main & Co. v. Haass*, 818 S.W.2d 381, 388 (Tex. 1991) ("We hold that provisions clearly intended to restrict the right to render personal services are in restraint of trade and must be analyzed for the same standards of reasonableness as covenants not to compete to be enforceable."). *See also Frankiewicz v. Nat'l Comp Assocs.*, 633 S.W.2d

8

505, 507 (Tex. 1982) (holding that an agreement forfeiting renewal commissions in the event of competition is a restraint on trade and is unenforceable unless the restrictions are reasonable). The reason is simple:

> If the damages provided are sufficiently severe, then the economic penalty's deterrent effect functions as a covenant not to compete as surely as if the agreement expressly stated that the departing member will not compete. The practical and economic reality of such a provision is that it inhibits competition virtually the same as a covenant not to compete.

*Haass*, 818 S.W.2d at 385–86. Because the Incentive Programs impose a severe economic penalty on Drennen if he chooses to compete, we conclude that under Texas law, the detrimental-activity provisions are noncompetition agreements and therefore must meet the reasonableness standards found in the Covenants Not to Compete Act. *Id.* at 388.

Under Texas law, a noncompetition agreement is enforceable if it contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the employer. *See* TEX. BUS. & COM. CODE ANN. § 15.50(a). Because ExxonMobil's detrimental-activity provisions meet none of these requirements, they are unenforceable under Texas law. *See id. See also Frankiewicz*, 633 S.W.2d at 507–08. Although much time and effort was spent discussing whether or not Drennen's incentive awards had vested, that question does not affect the outcome in this case. As *Haass* illustrates, courts do not focus on the exact nature or tax status of the benefit at risk, but on the magnitude of the potential economic penalty faced by the departing employee and the practical, realistic impact such a penalty has on the employee's willingness to compete. *See Haass*, 818 S.W.2d at 385–86 (holding that the imposition of a severe economic penalty as a consequence of competing renders an agreement a covenant not to compete).

9

In sum, the detrimental-activity provisions are covenants not to compete regardless of whether the law of Texas or New York applies; however, the provisions are enforceable in New York, but unenforceable in Texas. We therefore must address the choice-of-law issue.

## C.     *Which state's law applies?*

As already mentioned, the Incentive Programs contain a New York choice-of-law clause. Drennen contends the trial court correctly ignored the choice-of-law clauses in the Incentive Programs and instead applied Texas law.[8] ExxonMobil asserts that the trial court properly applied New York law in accordance with the Incentive Programs' terms.

Although the parties to an agreement generally have the freedom to choose the law of a specified jurisdiction to apply to the agreement, that freedom to choose is not unlimited. *DeSantis*, 793 S.W.2d at 677. The parties cannot require that their contract be governed by the law of a jurisdiction that has no relation to them or to their agreement. *Id.* In addition, the parties cannot thwart or offend the public policy of the state whose law would otherwise apply. *Id.*

To determine whether a choice-of-law provision will be given effect in a particular case, Texas courts follow the rule set forth in section 187 of the Second Restatement on Conflict of Laws. *Id.* (adopting the rule set forth in RESTATEMENT (SECOND) CONFLICT OF LAWS § 187 (1971)). That section provides as follows:

> (1) The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.
>
> (2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the

---

[8] The trial judge stated on the record during trial that he was applying Texas law; however, the trial court did not sign the judgment in this case for eleven months after this statement, and the outcome in the case suggests that the trial court ultimately applied New York law.

10

parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either

> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

(3) In the absence of a contrary indication of intention, the reference is to the local law of the state of the chosen law.

RESTATEMENT (SECOND) CONFLICT OF LAWS § 187.

Because the issue before us—whether a noncompetition agreement is enforceable—is not one that the parties could have resolved by an explicit contract provision, section 187(1) does not apply. *DeSantis*, 793 S.W.2d at 678.[9] Pursuant to section 187(2), the parties' choice of New York law must be given effect unless (a) New York lacks a substantial relationship to the parties or the transaction or there is no other reasonable basis for its choice; or (b) another state has a materially greater interest in the determination of whether the noncompetition provision is enforceable, and enforcement of the provision would be contrary to one of that state's fundamental policies. Here, the latter exception applies.

First, Texas has a materially greater interest than New York in the determination of whether the detrimental-activity provisions are enforceable against Drennen. ExxonMobil's corporate headquarters are in Texas, most of Drennen's work was performed in Texas; he signed the agreements in Texas; and he resides in Texas. *Cf. id.* at 678–79 (holding that Texas had a materially greater interest in the application of its law to a noncompetition agreement where some negotiations occurred in Florida and the

---

[9] Examples of issues that parties may not determine by explicit agreement include questions involving capacity, formalities, and validity. RESTATEMENT (SECOND) CONFLICT OF LAW § 187 cmt. d; *Swanson v. Image Bank, Inc*, 77 P.3d 439, 443 (Ariz. 2003).

employer partially performed its obligations there, but the employee signed the agreement in Texas and worked in Texas); *id.* ("[T]he gist of the agreement in this case was the performance of personal services in Texas. As a rule that factor alone is conclusive in determining what state's law is to apply." (citing RESTATEMENT (SECOND) CONFLICT OF LAWS § 196 (1971))). *See also Chesapeake Operating, Inc.v. Nabors Drilling USA, Inc.*, 94 S.W.3d 163, 174 (Tex. App.—Houston [14th Dist.] 2002, no pet.) (en banc) (explaining that the provision at issue affects the weight of the factors involved in the determination of which state has a materially greater interest, and distinguishing the analysis of oilfield indemnity provisions from noncompetition agreements because in the latter, Texas law was intended to protect the employee). Second, the issue of whether non-competition agreements are reasonable restraints upon employees who live and work in this state is a matter of fundamental Texas public policy. *DeSantis*, 793 S.W.2d at 680–81. And third, application of New York law would be contrary to that fundamental policy. Although the noncompetition provisions at issue here would be enforceable under the employee-choice doctrine of New York law, the rationale underlying this doctrine has been rejected by both the Texas legislature and the Texas Supreme Court. *See* TEX. BUS. & COM. CODE ANN. § 15.50; *Frankiewicz*, 633 S.W.2d at 507 (rejecting argument that a noncompetition agreement lacking reasonable limitations is nevertheless enforceable because the employee "was free to compete as long as he was willing to forego" the post-employment benefits).

Finally, ExxonMobil's argument that New York law should apply is not persuasive. At its heart, this argument is that, as a large, multi-national corporation, ExxonMobil has a strong interest in uniform application of its employment agreements. Even if the interest of a multi-national corporation could trump the fundamental public policy of the State of Texas,[10] we conclude ExxonMobil's own agreements defeat that self-professed interest in

---

[10] *But see DeSantis*, 793 S.W.2d at 680 (stating that, if Texas law was not applied to covenants not to compete involving Texas residents, "[e]mployers would be encouraged to attempt to invoke the most favorable state law available to govern their relationship with their employees in Texas or other states").

uniformity: in both Incentive Programs, ExxonMobil includes an exception for foreign-national employees to accommodate local laws and tax policies. If creating this exception does not significantly impede ExxonMobil's operations, we conclude that making the same accommodation for a long time Texas resident, whose work was in Texas and who signed the agreements in Texas, similarly would not be excessively disruptive.

ExxonMobil has not sought to enjoin Drennen from accepting employment with Hess, but instead, simply canceled Drennen's incentive awards. Because the detrimental-activity provisions are unenforceable under Texas law, they cannot support ExxonMobil's action. *Cf. Frankiewicz*, 633 S.W.2d at 507–08 (stating that, for purposes of monetary damages, a restrictive covenant must stand or fall as written).

We sustain Drennen's sole issue on appeal.

### III. CONCLUSION

We hold that the detrimental-activity provisions of the Incentive Programs are noncompetition agreements under both New York and Texas law; that these provisions are enforceable under the employee-choice doctrine of New York law but unenforceable under Texas law; that Texas has a materially greater interest than New York in the application of its law to this dispute; and that application of New York law would be contrary to Texas fundamental public policy. We therefore reverse the trial court's judgment and remand the case with instructions to the trial court to (a) order ExxonMobil to deliver Drennen's incentive awards to him upon the successful completion of any applicable restricted period, (b) conduct further proceedings to address Drennen's claims for attorney's fees and any other relief to which he may be entitled in accordance with this opinion, and (c) render judgment in Drennen's favor, including in the judgment his requested declaration that under Texas law, the detrimental-activity provisions of the Incentive Programs cannot be

13

enforced against him or be used as a basis for canceling or forfeiting such awards.

/s/    Tracy Christopher
       Justice

Panel consists of Chief Justice Hedges and Justices Christopher and Jamison.

14