# IN THE SUPREME COURT OF TEXAS

═══════════════

No. 12-0621

═══════════════

EXXON MOBIL CORPORATION, PETITIONER,

v.

WILLIAM T. DRENNEN, III, RESPONDENT

═══════════════════════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FOURTEENTH DISTRICT OF TEXAS

═══════════════════════════════════════════════

**Argued November 6, 2013**

JUSTICE GREEN delivered the opinion of the Court.

JUSTICE GUZMAN and JUSTICE LEHRMANN did not participate in the decision.


In this declaratory judgment action, we consider whether New York choice-of-law provisions in a Texas-based corporation's executive bonus-compensation incentive programs are enforceable and, if not, whether the programs' provisions allowing forfeiture of an executive's bonus awards for engaging in "detrimental activity" are enforceable under Texas law. We hold that the New York choice-of-law provisions in the executive compensation plan are enforceable and that the detrimental-activity provisions are enforceable under New York law. Accordingly, without reaching the second question, we reverse the court of appeals' judgment and render judgment in favor of the corporation.

## I. Factual and Procedural Background

William Drennen, III, worked as a geologist with Exxon Mobil Corporation (ExxonMobil) in Houston for over thirty-one years, from 1976 through May of 2007, culminating his career with the title of Exploration Vice President of the Americas. During his employment, he received several forms of incentive compensation, including participation in the 1993 Incentive Program and the 2003 Incentive Program (Incentive Programs). Compensation under the Incentive Programs included bonus awards, awards of restricted stock options, and earnings bonus units. Each time Drennen received restricted stock, he signed a restricted-stock agreement that adopted the terms of the Incentive Programs. These agreements were executed in Texas by both Drennen and ExxonMobil—Drennen in Houston and ExxonMobil through its corporate representatives at its corporate headquarters in Irving. During his thirty-one years of employment, Drennen was awarded a total of 73,900 shares of restricted ExxonMobil (XOM) stock. Under the terms of the Incentive Programs, 50% of the shares were to be delivered to Drennen (no longer restricted) three years after each grant, with the remaining 50% to be delivered seven years after each grant.

The Incentive Programs both include choice-of-law provisions providing for application of New York law, although ExxonMobil is headquartered in Texas and incorporated in New Jersey.[1] The Incentive Programs contain termination provisions that enabled ExxonMobil to terminate the outstanding awards if the employee (1) engaged in a detrimental activity, or (2) left ExxonMobil by either "not terminating normally" (terminating before the standard retirement plan without written

---

[1] The choice-of-law provisions state that "all actions taken under the [Incentive] Program shall be governed by the laws of the State of New York."

approval) under the 1993 Incentive Program or "resigning" (early retirement at the initiative of the employee) under the 2003 Incentive Program. "Detrimental activity" is defined under the 1993 Incentive Program as "activity that is determined in individual cases by the administrative authority to be detrimental to the interest of the Corporation of any affiliate." "Detrimental activity" is defined under the 2003 Incentive Program as "acceptance . . . of duties to a third party under circumstances that create a material conflict of interest," where a "material conflict of interest" includes when a grantee "becomes employed . . . by an entity that regulates, deals with, or competes with the Corporation or an affiliate."

Until 2006, Drennen consistently ranked in the top 20% of ExxonMobil employees in his annual review. However, after ExxonMobil implemented a new ranking system in 2006, Drennen received a very unfavorable annual performance review, allegedly a result of his age and the new C.E.O.'s desire to bring in a younger group of vice presidents. In December 2006, he was told by Tim Cejka, his supervisor, that he would be replaced at ExxonMobil and that they were trying to find him a new position but were thus far unsuccessful. Drennen asked about his unvested options should he leave and was told by Cejka that, so long as he did not go to work for one of the other four "majors" (Shell, BP, ChevronTexaco, or ConocoPhilips), he would be fine.

In March 2007 Drennen submitted his letter of resignation, stating his intent to retire in May. Upon his retirement, Drennen had already received 16,700 shares of XOM stock without restriction and had cashed out $4 million in pension funds, $1.8 million in 401(k) funds, and $3 million in stock options. However, Drennen had 57,200 shares still in the restricted period. Before his retirement, Drennen informed Cejka that he was considering taking a position at Hess Corporation (another large

energy company), and Cejka warned him that if he accepted the position, "it would be highly likely that [Drennen] would lose all [of his] incentives." Despite this warning, Drennen accepted the position and began working at Hess as Senior Vice President for Global Exploration and New Ventures in July 2007.

Shortly thereafter, Drennen's former supervisor, Cejka, sent him a letter cancelling his incentive awards, explaining that Hess is a direct competitor of ExxonMobil so there is a material conflict of interest, constituting detrimental activity under both Incentive Programs. Therefore, Drennen's 57,200 outstanding restricted shares of ExxonMobil were forfeited and "cancelled" by the plan administrator.

Drennen sued to recover the restricted stock, which ExxonMobil claimed he forfeited when he accepted the position with Hess, a competitor. Drennen sought a declaratory judgment that: (1) the detrimental-activity provisions in the Incentive Programs were being utilized as covenants not to compete; (2) the covenants not to compete are unenforceable because they are not limited as to time, geographic area, or scope of activity; and (3) therefore, ExxonMobil's cancellation of the restricted shares and bonus units was an impermissible attempt to recover monetary damages for an alleged breach of an unenforceable covenant not to compete. The parties agreed that the declaratory-judgment action would be decided by the trial court after the jury verdict. Additionally, Drennen brought a claim for breach of an oral contract (the conversation between Drennen and Cjeka that Drennen could retain his incentive awards so long as he did not go work for one of the four other "majors"), raised a waiver or estoppel argument based on Cjeka's assertions, and claimed that the Incentive Program agreements had been modified by his conversation with Cjeka.

4

The jury found for ExxonMobil on all claims and theories put before it—the breach of contract claim, the waiver and estoppel theory, and the oral contract modification theory. Drennen moved for judgment notwithstanding the verdict (JNOV), urging the court to find that the detrimental-activity provisions in the Incentive Programs are unenforceable covenants not to compete under Texas law. The trial court denied the motion, rejected Drennen's arguments on the declaratory-judgment action, and entered a take-nothing judgment for ExxonMobil. Drennen did not challenge the jury verdict on appeal; rather, he appealed the denial of the JNOV, arguing that Texas public policy prohibits enforcement of the detrimental-activity provisions in the Incentive Programs as void covenants not to compete.

The court of appeals reversed and ordered the trial court to render a declaratory judgment for Drennen. 367 S.W.3d 288, 298 (Tex. App.—Houston [14th Dist.] 2012), *pet. granted*, 56 Tex. Sup. Ct. J. 861, 864 (Aug. 26, 2013). The court of appeals held that the forfeiture conditions were unreasonable covenants not to compete, which are unenforceable under Texas law as a matter of public policy. *See id.* at 295. Applying conflicts-of-law analysis under the Restatement, the court of appeals refused to apply New York law because the result would be against Texas fundamental policy. *See id.* at 296–97 (citing RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187(2)). Therefore, the court of appeals held that Texas law applies because the choice-of-law provisions are unenforceable and held that the detrminental-activity provisions, as forfeiture conditions, are unenforceable covenants not to compete under Texas law. *Id.* at 298.

ExxonMobil petitioned this Court for review, arguing primarily that the choice-of-law provisions are enforceable and the detrimental-activity provisions should, therefore, be enforced

5

under New York law. Alternatively, ExxonMobil argues that, even if Texas law applies, the detrminental-activity provisions should be enforced under Texas law.

## II. Discussion

We begin our analysis by determining whether the choice-of-law provisions, electing to apply New York law for all disputes arising out of the Incentive Programs, are enforceable.

### A. Enforceability of the Choice-of-Law Provisions

ExxonMobil argues that New York law should govern because the choice-of-law provisions are enforceable under the Restatement. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187. We first note that Texas law recognizes the "party autonomy rule" that parties can agree to be governed by the law of another state. *See DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 677 (Tex. 1990); *cf.* TEX. BUS. & COM. CODE § 1.301(a) ("[W]hen a transaction bears a reasonable relation to this state and also to another state or nation the parties may agree that the law either of this state or of such other state or nation shall govern their rights and duties."). While we recognize that parties "cannot require that their contract be governed by the law of a jurisdiction which has *no relation whatever* to them or their agreement," *DeSantis*, 793 S.W.2d at 677 (emphasis added), both Texas and New York bear some relation to the parties and the agreements at issue in this case. ExxonMobil is now headquartered in Texas, and Drennen worked in Houston when he executed both Incentive Program agreements. But Drennen spent three years of his career working for ExxonMobil in its New York City office in the mid-1980s. Additionally, ExxonMobil's outside counsel is a New York law firm. Finally, the subject-matter of the transaction—XOM shares—are traded on the New

6

York Stock Exchange and are valued based on the average of the high and low price of the shares as reported on the consolidated tape at the New York Stock Exchange in New York City.

In *DeSantis v. Wackenhut Corp.*, we adopted Restatement section 187, which provides the framework for determining whether the parties' agreement as to choice of law is enforceable.[2] *See* 793 S.W.2d at 677–78; *see also* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187. Section 187(2) provides:

> The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either
>
> > (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
> >
> > (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of applicable law in the absence of an effective choice of law by the parties.

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187(2).

We have already explained that some relationship exists between the parties and agreements in this case and their chosen jurisdiction. Nowhere does the Restatement define "substantial relationship," nor have we defined the term. The comments to the Restatement do indicate, however, that parties will be held to their choice when "the state of the chosen law [has] a sufficiently close

---

[2] Section 187 has two subparts. However, the parties do not argue that section 187(1) applies. Section 187(1) provides that the law of the chosen state governs if the particular issue to be decided is one which the parties could have explicitly resolved in their agreement. RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187(1). This Court held in *DeSantis* that the issue of whether a non-compete agreement is enforceable is not a question the parties could have resolved by explicit provision, so section 187(1) does not apply. *See* 793 S.W.2d at 678.

7

relationship to the parties and the contract to make the parties' choice reasonable." *Id.* § 187 cmt. f. Even when a relationship is not substantial, the parties may be held to the chosen state's law when they had a reasonable basis for their choice, such as choosing law they know well or that it is well developed. *Id.* Here, ExxonMobil claims that the choice of New York law was reasonable because it assures uniformity, certainty, and predictability in the application of its Incentive Programs. ExxonMobil provided affidavit testimony that New York law was chosen to govern its incentive agreements for three reasons: (1) ExxonMobil provides incentive awards to large numbers of employees in many states and countries, many of whom move throughout their careers, so consistency is required to administer the Incentive Programs; (2) New York has a well-developed and clearly defined body of law regarding employee stock and incentive programs; and (3) ExxonMobil's stock is listed on the New York Stock Exchange, and New York—as home of the Stock Exchange—has a well-developed and predictable body of law regarding a wide variety of financial transactions, securities, and securities-related transactions, making it a routine choice of law for parties to stock-related transactions and agreements. Indeed, the Restatement recognizes that the prime objectives of contract law—protecting parties' expectations and enabling parties to predict accurately what their rights and liabilities will be—are best furthered, and certainty and predictability of result most likely to occur, when parties to multistate transactions can choose the governing law. *Id.* § 187 cmt. e. Further, "[c]ontracts are entered into for serious purposes and rarely, if ever, will the parties choose a law without good reason for doing so." *Id.* § 187 cmt. f. Under the circumstances of this case, we conclude that section 187(2)(a) of the Restatement does not preclude application of New York law.

8

We must next determine, in accordance with the three-step approach set forth in *DeSantis*, 793 S.W.2d at 678, whether Drennen and ExxonMobil's choice of New York law is enforceable under section 187(2)(b) of the Restatement.

**1. Most Significant Relationship**

The first determination of Restatement section 187(2)(b) is "whether there is a state the law of which would apply under section 188 of the Restatement absent an effective choice of law by the parties." *DeSantis*, 793 S.W.2d at 678. This inquiry evaluates "whether a state has a more significant relationship with the parties and their transaction than the state they chose." *Id.* Thus, in *DeSantis* we considered whether the relationship of the transaction and parties to Texas was clearly more significant than their relationship to the chosen state, taking into account such factors as the locations of the parties, the location of negotiations of the agreement, the location of the execution of the agreement, and the place of performance. *See id.* at 678–79. Here, the parties are both located in Texas, as ExxonMobil is headquartered in Irving and Drennen is a Houston resident; the negotiations, if any, took place in Houston, as did the execution of the Incentive Program agreements; and the performance of the contract took place in Houston, Drennen's place of employment, and in Irving, at ExxonMobil's headquarters. However, ExxonMobil is a multi-national corporation with a presence in New York.[3] Additionally, as discussed above, Drennen spent

---

[3] *See, e.g.*, *Exxon Corp. v. Cent. Gulf Lines, Inc.*, 500 U.S. 603, 604–06 (1991) (detailing Exxon's business dealings in New York); *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 725 F.3d 65, 78–88 (2d Cir. 2013) (detailing ExxonMobil's conduct in New York leading to liability for environmental contamination), *cert. denied sub nom. Exxon Mobil Corp. v. City of New York*, 134 S. Ct. 1877 (2014); *Exxon Corp. v. Duval Cnty. Ranch Co.*, 406 F. Supp. 1367, 1368 (S.D. Tex. 1975) (explaining that, at the time, Exxon maintained its principal place of business in the State of New York).

three years of his career with ExxonMobil working in its New York City office. While the transaction and parties bear relations to both states, weighing the respective interests between New York and Texas, we conclude that the relationship of the transaction and parties to Texas is more significant than their relationship to New York. *See id.* at 679.

## 2. Materially Greater Interest

Under the Restatement, if Texas does not have a materially greater interest than New York in the determination of this particular issue, it is immaterial whether the application of New York law here would be contrary to a fundamental policy of Texas. *See id.* at 679. The next step in the analysis, then, is determining whether Texas has a materially greater interest in the determination of whether the detrimental-activity provisions are enforceable. *Id.*

In *DeSantis*, we considered both the specific facts of the case and the agreement's potential impact on the employee to determine whether Texas had a materially greater interest than did Florida, the chosen state. *See id.* Wackenhut, the employer, was headquartered in Florida, and the parties chose the law of Florida to govern the non-compete. *Id.* at 675. We recognized that Florida shared an interest with Texas in protecting the justifiable expectations of entities doing business in several states and noted that Florida had a direct interest in the enforcement of the agreement in protecting a national business headquartered in Florida. *Id.* at 679. However, we noted that Texas was directly interested in: (1) DeSantis—as an employee in Texas; (2) Wackenhut—as a national employer doing business in Texas; (3) the new business DeSantis formed in Texas in violation of the non-compete; and (4) consumers of the services in Texas. *Id.* We ultimately held that Texas clearly had a materially greater interest in whether the agreement should be enforced. *Id.*

10

Here, ExxonMobil argues that Texas has no "materially greater interest" in the enforceability of the forfeiture conditions than New York because New York law was chosen for uniformity and predictability. The weight of the interests involved in *DeSantis* appear very similar to those involved here. So while New York shares with Texas a general interest in protecting the justifiable expectations of entities doing business in several states, that does not outweigh Texas's interests in this transaction. Having concluded in *DeSantis* that Texas had a materially greater interest in enforcement of the agreement than Florida when the employer at issue was Floridian, *see* 793 S.W.2d at 679, we must conclude that Texas has a materially greater interest than New York here, where both the employee and the employer are Texas residents. The second step of the analysis weighs in favor of Texas.

### 3. Contrary to Fundamental Policy

The final step in the analysis is determining whether the application of New York law would be contrary to a fundamental policy of Texas. *Id.* at 678; *see also* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187(2)(b). In *DeSantis*, we recognized that neither this Court nor the Restatement has adopted a general definition of "fundamental policy," and we declined to define it then. 793 S.W.2d at 680. We determined that applying the Florida choice-of-law provision would contravene fundamental policy in Texas because the law governing enforcement of non-competes is fundamental policy in Texas, and that "to apply the law of another state to determine the enforceability of such an agreement *in the circumstances of a case like this* would be contrary to that policy." *Id.* at 681 (emphasis added). Notably, we based this reasoning, at least in part, on the desire to avoid "disruption of orderly employer-employee relations [and] competition in the marketplace."

11

*Id.* at 680. We must, then, determine whether the provisions at issue in the Incentive Programs are covenants not to compete.

In this Court's most recent decision involving a non-compete provision, *Marsh USA Inc. v. Cook*, 354 S.W.3d 764 (Tex. 2011), we did not address this particular question because the parties agreed that the provision in question was governed by the Covenants Not to Compete Act. *See id.* at 768. We laid out a general definition for covenants not to compete: "Covenants that place limits on former employees' professional mobility or restrict their solicitation of the former employers' customers and employees are restraints on trade and are governed by the Act." *Id.* The agreement here, arguably, does not fit within this definition as it does not "limit" Drennen's professional mobility, per se.

Looking at the facts in our prior non-compete cases, it is clear that the agreement here does not fit the mold. In *Marsh*, the employee agreed that he would not solicit or accept business of the type offered by his employer, perform or supervise any services related to that business, solicit clients, or solicit employees for a period of two years following his termination. *Id.* at 767. In another landmark non-compete case, *Light v. Centel Cellular Co. of Texas*, 883 S.W.2d 642 (Tex. 1994), the employee agreed that, upon termination of employment and for one year after, she would not directly or indirectly compete with her employer in the Longview–Tyler–Kilgore–Marshall service area. *Id.* at 645 n.8. Finally, in *DeSantis v. Wackenhut Corp.*, a third historic Texas non-compete case, the employee signed an agreement that, as long as he was employed by Wackenhut and for two years thereafter, he would not compete in any way with Wackenhut in a forty-county area in south Texas. 793 S.W.3d at 675.

12

There is a difference, although a narrow one, between an employer's desire to protect an investment and an employer's desire to reward loyalty. Non-competes protect the investment an employer has made in an employee, ensuring that the costs incurred to develop human capital are protected against competitors who, having not made such expenditures, might appropriate the employer's investment. *Marsh*, 354 S.W.3d at 769. Forfeiture provisions conditioned on loyalty, however, do not restrict or prohibit the employees' future employment opportunities. Instead, they reward employees for continued employment and loyalty. As we recognized in *Marsh*, employee stock-ownership plans have a purpose that is unrelated to restraining competition—linking the interest of key employees with the employer's long-term success. *See id.* at 777. Under a non-compete, the former employer can bring a breach of contract suit to enforce the clause. But under a forfeiture provision, the former employer does not need to take legal action because the profit-sharing plan belongs to the employer.

In *Marsh*, we were faced with an employee stock-ownership plan with a restrictive covenant, and we held that the covenant was an enforceable non-compete. *See id.* at 766. However, the provision in *Marsh* was materially different from the provision presented here in ExxonMobil's Incentive Programs. In *Marsh*, to exercise a stock option under the plan's terms, employees were required to provide the employer with written notice that the employee was exercising his option, pay for the stock at the discounted stock price, and sign a non-solicitation agreement. *Id.* at 767. The non-solicitation agreement was held to be an enforceable non-compete. *Id.* at 766. The issue in *Marsh* was not whether the agreement was a covenant not to compete, or even whether the terms of the agreement made it unenforceable, but rather whether, under *Light* and the Texas Covenants

13

Not to Compete Act, the non-compete was an unenforceable contract because it did not appear to be ancillary to or part of an otherwise enforceable agreement. *Id.* at 767–68; TEX. BUS. & COM. CODE § 15.50. A divided Court held that such independent agreements are enforceable so long as the consideration for the non-compete is reasonably related to the company's interest in protecting its goodwill, vacating that part of *Light* which held that a unilateral non-compete agreement supported by consideration did not meet the requirement that the covenant be ancillary to or part of an otherwise enforceable agreement. *Marsh*, 354 S.W.3d at 775–76, 780.

Here, the detrimental activity provisions in the Incentive Programs are not like the provisions in *Marsh*, *Light*, or *DeSantis*. They are, however, similar to the provision at stake in *Peat Marwick Main & Co. v. Haass*, 818 S.W.2d 381 (Tex. 1991). Haass, an accountant, begrudgingly signed a merger agreement with the accounting firm of Main Hurdmann (MH)[4] whereby he promised to compensate MH as provided for in the partnership agreement should Haass withdraw from MH and take MH clients with him.[5] *Id.* at 383. After Haass left MH, the firm sued him for breach of the partnership agreement and breach of fiduciary duty. *Id.* at 384. Haass, in response, asserted that the agreement operated in restraint of trade and as a penalty, and was thus unenforceable and counterclaimed for his capital account, which MH was holding. *Id.* The parties disagreed as to

---

[4] Before suit was filed, Main Hurdmann merged with another large international accounting firm to form Peat Marwick Main & Co. *Haass*, 818 S.W.2d at 382 n.1. Peat Marwick succeeded to the interest of Main Hurdman and was the party on appeal. *Id.*

[5] While Haass never signed the partnership agreement itself, the provision in the partnership agreement referenced by and incorporated in the merger agreement contained a section titled "Termination Other Than by Retirement—Payment to Firm." *See id.* at 383 n.3. That section provided that a partner is liable to the firm for the costs of acquiring the client and any fees and expenses due to the firm from such clients, should the partner (1) terminate for any reason other than retirement, and (2) within two years of leaving the firm, solicit or provide services to any current client of MH or client acquired by MH in the two years after termination. *Id.*

whether this provision was, in fact, a covenant not to compete. *Id.* at 384–85. The provision in question did not expressly prohibit Haass from providing accounting services to clients of MH and was not an express promise by Haass not to compete. *See id.* at 385–86. While we ultimately determined that the provision in *Haass* was an unreasonable restraint of trade, notably, we never concluded that the damage provision was, itself, a covenant not to compete. *See id.* at 385–87. Further, we did not provide a definition of a covenant not to compete. *See generally id.* at 385–88. The Covenants Not to Compete Act likewise does not define what it is to be a covenant not to compete. *See* TEX. BUS. & COM. CODE §§ 15.50–.52.

It is not necessary here to answer the question of what it means to be a covenant not to compete any more than it was in *Haass* or *Marsh*. Drennen did not promise to refrain from competing with ExxonMobil or refrain from soliciting clients or employees from ExxonMobil. Instead, he agreed that, in reward for his hard work and loyalty, he would receive bonus compensation in the form of stock options. One of the conditions of this bonus compensation was continued loyalty, which was not a promise on Drennen's part, but rather a power reserved to his employer should he opt into the Incentive Programs. If he chose to compete with ExxonMobil (which he did), he would forfeit the shares still in the restricted phase that were to be awarded as bonus compensation. There is a distinction between a covenant not to compete and a forfeiture provision in a non-contributory profit-sharing plan because such plans do not restrict the employee's right to future employment; rather, these plans force the employee to choose between competing with the former employer without restraint from the former employer and accepting benefits of the retirement plan to which the employee contributed nothing. *See Dollgener v. Robertson Fleet Servs.,*

15

*Inc.*, 527 S.W.2d 277, 278–80 (Tex. Civ. App.—Waco 1975, writ ref'd n.r.e.). Whatever it may mean to be a covenant not to compete under Texas law, forfeiture clauses in non-contributory profit-sharing plans, like the detrimental-activity provisions in ExxonMobil's Incentive Programs, clearly are not covenants not to compete.

Accordingly, we hold that, under Texas law, this provision is not a covenant not to compete. Whether such provisions in non-contributory employee incentive programs are unreasonable restraints of trade under Texas law, such that they are unenforceable, is a separate question and one which we reserve for another day. *See Haass*, 818 S.W.2d at 385–86.

Turning back to our analysis under Restatement section 187(2)(b), we can easily distinguish the current case from our holding in *DeSantis*. First and most importantly, ExxonMobil's Incentive Programs do not involve covenants not to compete. *See discussion, infra*. Second, the policy concerns regarding uniformity of law raised in *DeSantis* have changed in the past twenty-four years. *See Funk v. United States*, 290 U.S. 371, 381 (1933) ("The public policy of one generation may not, under changed conditions, be the public policy of another."). With Texas now hosting many of the world's largest corporations,[6] our public policy has shifted from a patriarchal one in which we valued uniform treatment of Texas employees from one employer to the next above all else, to one in which we also value the ability of a company to maintain uniformity in its employment contracts across all employees, whether the individual employees reside in Texas or New York. This prevents the

---

[6] Fifty-two of the 2014 Fortune 500 Companies maintain headquarters in Texas, placing Texas third behind California and New York's fifty-four companies. Maria Halkias, *Texas Remains Near Top for Fortune 500 Companies*, THE DALL. MORNING NEWS, June 3, 2014, *available at* 2014 WLNR 14947032.

16

"disruption of orderly employer-employee relations" within those multistate companies and avoids disruption to "competition in the marketplace." *DeSantis*, 793 S.W.2d at 680.

The drafters of the Restatement explained the rationale for section 187 by stating that "[p]rime objectives of contract law are to protect the justified expectations of the parties and to make it possible for them to foretell with accuracy what will be their rights and liabilities." RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187 cmt. e. In multistate transactions, these prime objectives "may best be attained . . . by letting the parties choose the law to govern the validity of the contract." *Id.* Our fear in *DeSantis* that "[e]mployers would be encouraged to attempt to invoke the most favorable state law available to govern their relationship with their employees in Texas or other states," 793 S.W.2d at 680, is directly addressed by the drafters of the Restatement:

> It may . . . be objected that, if given this power of choice, the parties will be enabled to escape prohibitions prevailing in the state which would otherwise be the state of the applicable law. Nevertheless, the demands of certainty, predictability and convenience dictate that, subject to some limitations, the parties should have power to choose the applicable law.

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187 cmt. e. As the court of appeals noted, ExxonMobil's argument, in essence, is that, "as a large, multi-national corporation, ExxonMobil has a strong interest in uniform application of its employment agreements." 367 S.W.3d at 297. Uniformity is a frequent goal of contracting, as recognized in the comments to Restatement section 187, and parties should be able to achieve that goal by choosing the applicable law. While application of Texas and New York law may reach different results on the enforceability of these particular detrimental-activity provisions—which we do not decide today—we cannot conclude that

17

applying New York law in such a determination is "contrary to a fundamental policy" of Texas.[7] *See*

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187 cmt. g ("The forum will not refrain from

applying the chosen law merely because this would lead to a different result than would be obtained

under the local law of the state of the otherwise applicable law."); *see also DeSantis*, 793 S.W.2d

at 680 ("[T]he result in one case cannot determine whether the issue is a matter of fundamental state

policy for purposes of resolving a conflict of laws."). Because enforcement of New York law does

not contravene any fundamental public policy of Texas, we are bound to enforce the parties' choice-

of-law provisions and apply New York law.

## B. Application of New York Law

In the Court of Appeals of New York's certified-question case of *Morris v. Schroder Capital*

*Management International*, 859 N.E.2d 503 (N.Y. 2006), the New York high court analyzed an

almost identical set of facts. As a portion of his year-end bonus, the plaintiff-employee, Paul Morris,

was awarded deferred compensation bonuses for the years 1997, 1998, and 1999 that would vest in

---

[7] We recognize that other jurisdictions have held, as we did in *DeSantis*, that the application of another state's law which results in the enforcement of a non-competition agreement contravenes the forum state's fundamental public policy. *See Dresser Indus., Inc. v. Sandvick*, 732 F.2d 783, 787–88 (10th Cir. 1984) ("[T]he tendency of the courts [is] to apply the policy of the forum state when parties are litigating covenants not to compete."); *Nordson Corp. v. Plasschaert*, 674 F.2d 1371, 1375 (11th Cir. 1982); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Stidham*, 658 F.2d 1098, 1100 n.5 (5th Cir. Unit A 1981); *Davis v. Jointless Fire Brick Co.*, 300 F. 1, 3–4 (9th Cir. 1924); *Muma v. Fin. Guardian, Inc.*, 551 F. Supp. 119, 121–23 (E.D. Mich. 1982); *Walling Chem. Co. v. Hart*, 508 F. Supp. 338, 340 (D. Neb. 1981); *Fort Smith Paper Co. v. Sadler Paper Co.*, 482 F. Supp. 355, 357 (E.D. Okl. 1979); *Blalock v. Perfect Subscription Co.*, 458 F. Supp. 123, 127 (S.D. Ala.1978), *aff'd per curiam*, 599 F.2d 743 (5th Cir. 1979); *Assoc. Spring Corp. v. Roy F. Wilson & Avnet, Inc.*, 410 F. Supp. 967, 976–78 (D.S.C. 1976); *Fine v. Prop. Damage Appraisers, Inc.*, 393 F. Supp. 1304, 1310 (E.D. La. 1975); *Boyer v. Piper, Jaffray & Hopwood, Inc.*, 391 F. Supp. 471, 473 (D.S.D. 1975); *Forney Indus., Inc. v. Andre*, 246 F. Supp. 333, 334–35 (D.N.D. 1965); *Nasco, Inc. v. Gimbert*, 238 S.E.2d 368, 369 (Ga. 1977); *Std. Register Co. v. Kerrigan*, 119 S.E.2d 533, 541–42 (S.C. 1961); *Temporarily Yours–Temp. Help Servs., Inc. v. Manpower, Inc.*, 377 So. 2d 825, 827 (Fla. Dist. Ct. App. 1979); *see also Barnes Group, Inc. v. C & C Prods., Inc.*, 716 F.2d 1023, 1031–32 (4th Cir. 1983); *Bush v. Nat'l Sch. Studios, Inc.*, 407 N.W.2d 883, 886–88 (Wisc. 1987) (suit for unfair termination). However, once again, it should be noted that this case does not involve a covenant not to compete. *See discussion infra*.

18

2001, 2002, and 2003. *Id.* at 505. Prior to the payments, Morris resigned and established a competing hedge fund. *Id.* The deferred compensation awards were each governed by a plan with a forfeiture provision that provided that if, before the end of the three-year vesting period, Morris resigned and took employment with a company that SIMNA, his then employer, considered to be a competitor, all deferred compensation would be forfeited. *Id.* Shortly after forming his own hedge fund, SIMNA notified Morris that he had forfeited his deferred compensation benefits by engaging in a business that competes with SIMNA. *Id.*

While recognizing that non-compete clauses in employment contracts are not favored and will be enforced only to the extent reasonable and necessary to protect valid business interests, the Court of Appeals of New York held that this forfeiture provision fell within the "employee choice" doctrine recognized in New York. *See id.* at 506. In cases where an employer conditions receipt of a benefit post-employment upon compliance with a restrictive covenant, the employee is given the choice to either preserve his rights under the contract by refraining from competition or forfeit such rights by exercising the right to compete. *Id.* Because the employee who leaves his employer voluntarily or is terminated with cause makes an informed choice between retaining the benefit by avoiding competitive employment or forfeiting his benefit by taking competitive employment, such a provision is not an unreasonable restraint upon an employee's liberty to earn a living. *See id.* When the doctrine applies, "a restrictive covenant will be enforceable without regard to reasonableness" so long as the employee voluntarily left his or her employment or was terminated for cause. *Id.* at 507; *see also Post v. Merrill Lynch, Pierce, Fenner & Smith*, 397 N.E.2d 358, 360–61 (N.Y. 1999).

19

Here, Drennen agreed to the detrimental-activity provisions in exchange for the receipt of additional incentive compensation, i.e., stock options. *See Int'l Bus. Mach. Corp. v. Martson*, 37 F. Supp. 2d 613, 617 (S.D.N.Y. 1999). By enrolling in the Incentive Programs, Drennen agreed that he would forfeit any outstanding awards should he engage in activity determined to be detrimental to the interest of ExxonMobil or should he accept employment with a competitor of ExxonMobil. The Incentive Programs' detrimental-activity provisions did not bar Drennen from seeking or accepting other employment, but rather gave Drennen the "choice of preserving his rights under the [Incentive Programs] by refraining from competition with [ExxonMobil] or risking forfeiture of such rights by exercising his right to compete with [ExxonMobil]." *See Lenel Sys. Int'l, Inc. v. Smith*, 966 N.Y.S.2d 618, 621 (N.Y. App. Div. 2013) (quoting *Kristt v. Whelan*, 164 N.Y.S.2d 239, 243 (N.Y. App. Div. 1957), *aff'd*, 155 N.E.2d 116 (N.Y. 1958)).

One essential element to the employee choice doctrine is the employer's "continued willingness to employ" the employee. *Morris*, 859 N.E.2d at 506 (quoting *Post*, 397 N.E.2d at 360–61). Should the employer terminate the employment relationship without cause, enforcement of the restrictive covenant is no longer reasonable. *See id.* at 506–07. If the employee left his employer voluntarily or engaged in conduct for which he was terminated for cause, a restrictive covenant will be enforceable without regard to reasonableness under the employee choice doctrine. *Id.* at 507. Here, Drennen was told by his supervisor during his annual review that his performance had suffered to the point where he would no longer continue overseeing ExxonMobil's exploration activities in the Western Hemisphere. Drennen was told that another position would be found for him within the company, but he retired four months later. Drennen made an informed choice

20

between forfeiting his outstanding awards or retaining the awards by avoiding competitive employment and voluntarily left his position with ExxonMobil. Therefore, under New York law, ExxonMobil lawfully terminated the outstanding awards upon Drennen's breach of the Incentive Programs and voluntary resignation from ExxonMobil. *See id.* at 507–08.

### III. Conclusion

Uniformity is a worthy goal and a logical rationale for choosing New York law and is a goal recognized in the Restatement (Second) of Conflict of Laws. While Texas law may or may not permit the enforcement of these detrimental-activity provisions, New York law does. Application of New York law, resulting in the enforcement of these provisions, does not contravene any fundamental policy in Texas. Accordingly, without determining the enforceability of the detrimental-activity provisions under Texas law, we reverse the court of appeals' judgment and, applying New York law, render a take-nothing judgment for ExxonMobil in accordance with the trial court's judgment.

_____
Paul W. Green
Justice

OPINION DELIVERED: August 29, 2014

21