# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

October 29, 2015

Lyle W. Cayce
Clerk

No. 14-20682
Consolidated with No. 15-20005

CHRIS CARDONI, an individual; WESLEY WEBB, an individual; TERRY BLAIN, an individual; BILLY SHAFFER, an individual,

> Plaintiffs - Appellees

v.

PROSPERITY BANK, a Texas Financial Institution,

> Defendant - Appellant

------------------------------------------------------------------------------------

PROSPERITY BANK,

> Plaintiff - Appellant

v.

CHRISTOPHER CARDONI; WESLEY WEBB; TERRY BLAIN; WILLIAM SHAFFER,

> Defendants - Appellees

Appeals from the United States District Court
for the Southern District of Texas

Before JOLLY, HIGGINSON, and COSTA, Circuit Judges.

GREGG COSTA, Circuit Judge:

No. 14-20682 cons w/ No. 15-20005

In addition to their well-known disagreements over boundaries[1] and football,[2] Texas and Oklahoma do not see eye to eye on a less prominent issue: covenants not to compete. Texas generally allows them so long as they are limited both geographically and temporally. Tex. Bus. & Com. Code Ann. § 15.50(a). Oklahoma generally does not. Okla. Stat. tit. 15, § 217. These different policy choices—Texas's view which prioritizes parties' freedom to contract and Oklahoma's which emphasizes the right to earn a living and competition—came to a head when Texas-based Prosperity Bank acquired Oklahoma-based F&M Bank and Trust Company. Prosperity entered into contracts with a number of the F&M bankers that included covenants not to compete, not to solicit, and not to disclose confidential information obtained while working at Prosperity. The agreements also provided that Texas law would govern the parties' relationship.

Four of the bankers later left Prosperity and went to work for a competitor. Both the bankers and Prosperity raced to the courthouse to file lawsuits that ended up being consolidated in federal court in Houston. Prosperity sought to enforce the restrictive covenants under Texas law, contending that the choice-of-law provision was valid. The district court denied Prosperity's applications for injunctive relief. It found that the choice-of-law provision was not enforceable with respect to the noncompetition and nonsolicitation provisions; instead, it applied Oklahoma law, under which it

---

[1] *See Oklahoma v. Texas*, 258 U.S. 574 (1922); *Oklahoma v. Texas*, 256 U.S. 70 (1921); *Oklahoma v. Texas*, 253 U.S. 465 (1920); *see also* Lonn W. Taylor, *Red River Bridge Controversy*, TEX. ST. HIST. ASS'N: HANDBOOK OF TEX. ONLINE, (June 15, 2010), http://www.tshaonline.org/handbook/online/articles/mgr02 (chronicling 1931 controversy over a bridge crossing the Red River which involved the Governor of Oklahoma declaring martial law and stationing National Guardsmen on both sides of the river).

[2] The authoring judge cannot help but note that the University of Texas leads the University of Oklahoma 61-44-5 in the Red River Rivalry. *See Red River Showdown*, WIKIPEDIA, https://en.wikipedia.org/wiki/Red_River_Showdown (last modified Oct. 12, 2015, at 3:24 PM).

concluded the covenants were not lawful. In contrast, the district court ruled that Texas law applied to the nondisclosure provisions, but denied injunctive relief to enforce that provision. Following the guidance of Texas courts on the enforcement of choice-of-law provisions, we affirm in part and reverse in part.

## I.

In August 2013, Prosperity acquired F&M. Prior to the merger, Chris Cardoni, Wesley Webb, and Terry Blain were Senior Vice Presidents of F&M in Tulsa focused on energy industry customers. As the energy group's team leader, Cardoni supervised Webb and Blain and other energy industry bankers, including a manager who worked in F&M's Dallas, Texas office.[3] Billy Shaffer, also a Senior Vice President of F&M in Tulsa, focused on middle market commercial customers.

In anticipation of the potential merger, Prosperity offered employment contracts to thirty-five senior-level F&M employees, including Cardoni, Webb, Blain, and Shaffer ("the bankers"). Prosperity considered the retention of these employees critical to the merger's successful completion. The bankers were given two days to accept the contracts, which were presented to them by F&M representatives. They were told that if they did not sign the contracts, the merger might fall apart or that, if the merger did come to pass, their jobs with Prosperity could not be guaranteed absent the contract. After multiple meetings with F&M representatives and discussions among themselves, the bankers signed the contracts in Oklahoma.[4] The contracts were then signed by Prosperity officials in Texas.

---

[3] The energy group's customers were dispersed throughout the United States. Immediately prior to the merger, Cardoni, Webb, and Blain "inherited" six accounts with Texas clients from F&M's office in Dallas, Texas. Cardoni contends that "[w]ith minimal exceptions, those inherited accounts represent the business the Plaintiffs have done that involves Texas."

[4] Only one of the thirty-five employees declined to sign the contract.

3

Except for the salary and common stock offered to each banker, the contracts do not differ in any respect relevant to this case. They provide for a three-year term as a senior vice president. The bankers' duties are to "solicit and service loan and depository accounts/relationships . . . associated with the locations of [Prosperity] in and around Tulsa, Oklahoma, which were previously locations of [F&M]." ROA.907 § 2.1. The contracts further provide that the bankers "shall work in Tulsa, Oklahoma and shall be furnished with an office and other business facilities and services[.]" *Id.* § 2.2.

The contracts also contain the three restrictive covenants that are the subject of this appeal. A nondisclosure agreement provides that, during or after their employment, the bankers will not "make any unauthorized disclosure, directly or indirectly, of any Confidential Information of [F&M] or [Prosperity], or third parties, or make any use thereof, directly or indirectly." ROA.909 § 6.1(c). A noncompetition clause provides that, for three years, the bankers will not "directly or indirectly" compete, engage, or be employed by a business entity within 50 miles of F&M's former banking centers "in a business similar to that of [F&M] or [Prosperity]." ROA.910 § 6.3(a); *see also* ROA.910 § 6.3(b) (providing that for three years the bankers will not "invest in, own, manage, operate, [or] control" a competitive business within 50 miles of F&M's former banking centers). A nonsolicitation agreement provides that, for three years, the bankers will not "directly or indirectly . . . solicit competing business from customers or prospective customers of [F&M] or [Prosperity]" if the banker made contact with that customer or had access to information and files about that customer within the twelve months prior to the termination of the banker's employment. ROA.910 § 6.3(c). Finally, the contracts contain a choice-of-law provision stating that Texas law will govern "[a]ll questions concerning the validity, operation and interpretation of this Agreement and the performance of the obligations imposed upon the parties hereunder" and a

No. 14-20682 cons w/ No. 15-20005

forum selection clause stating that that "[e]xclusive venue of any dispute relating to this Agreement shall be, and is convenient in, Texas." ROA.915 § 9.3.

The merger took effect in the spring of 2014. The bankers maintain that their compensation, benefits, and working conditions were worse off after the merger. On August 12, 2014 they gave notice of their intent to terminate their employment. In early September, the bankers went to work at CrossFirst Bank in Tulsa, which is approximately seven miles from the F&M/Prosperity location where they had been working.

Litigation had begun even before the bankers moved to CrossFirst. In June 2014, they filed a lawsuit against Prosperity[5] in Oklahoma state court, seeking a declaration that the covenants were void and asserting claims for tortious interference with business relations and false representation. Two days later, Prosperity filed suit in Texas state court seeking a declaration that the covenants were enforceable and asserting a claim for breach of contract. Both cases were removed to federal court on diversity grounds and consolidated in the Southern District of Texas pursuant to the forum selection clause.

A flurry of motions ensued. The bankers filed two motions in federal district court. First, they sought a ruling that Oklahoma law applies despite the contractual choice of Texas law. Second, they moved for partial summary judgment on their claim that the noncompetition and nonsolicitation agreements were unenforceable under Oklahoma law. Prosperity, meanwhile, filed an application for temporary and permanent injunctive relief to enforce the restrictive covenants under the chosen Texas law.

---

[5] The lawsuit also named two former F&M executives, Anthony Davis and Eric Davis, as defendants. For simplicity, we refer to all of the defendants as "Prosperity."

5

No. 14-20682 cons w/ No. 15-20005

The district court granted in part the bankers' motion for summary judgment, holding that Oklahoma law governed the noncompetition and nonsolicitation clauses but not the nondisclosure provision. The reason for the different ruling on the nondisclosure agreement was the court's conclusion that it—unlike the other two covenants—does not contravene a fundamental policy of Oklahoma. As a result, the court summarily denied Prosperity's request for injunctive relief which had been based on the belief that Texas law governed all three clauses, without prejudice to refiling. Prosperity then moved under Rule 59(e) to alter or amend the district court's order. In its motion, Prosperity requested that the nonsolicitation agreement be reformed and enforced under Oklahoma law, and sought reconsideration of the choice-of-law determination as to Cardoni because of his contacts with Texas. The district court denied the motion.

Prosperity then filed its second application for injunctive relief. This motion focused on the nondisclosure agreement that the district court found was governed by Texas law. The proposed injunction would prevent the bankers from disclosing Prosperity's confidential information pending trial. Not wanting to leave any stone unturned, Prosperity then filed a supplement to this motion requesting an injunction requiring the bankers to comply with the noncompetition and nonsolicitation agreements even assuming Oklahoma law applies to them. After holding an evidentiary hearing, the court denied the request. Although it believed that the information provided to the bankers was arguably confidential, the court concluded that Prosperity had not shown that the bankers had disclosed that information. Prosperity thus did not establish a substantial likelihood of ultimately prevailing or irreparable injury.

No. 14-20682 cons w/ No. 15-20005

Prosperity brings interlocutory appeals of both denials of injunctive relief, as well as the denial of the motion to alter or amend. Another panel of this court denied Prosperity's motion for injunctive relief pending the appeal. We now consider the consolidated appeals.

## II.

We have jurisdiction over orders denying a request for a preliminary injunction. 28 U.S.C. § 1292(a)(1). That jurisdiction extends to other rulings that are inextricably intertwined with the injunction rulings. *See Ali v. Quarterman*, 607 F.3d 1046, 1048 (5th Cir. 2010). The parties agree that the district court's ruling that Oklahoma law applies was a key factor in its denial of the injunction. So do we. Indeed, the district court recognized the central role of the choice-of-law analysis in the injunction ruling when it invited a renewed motion for injunctive relief after determining the applicable law. Prosperity further contends, this time with opposition, that the summary judgment ruling rejecting Prosperity's backup argument—that the noncompetition and nonsolicitation provisions are enforceable even if Oklahoma law applies—is also sufficiently intertwined with Prosperity's request for injunctive relief to be considered in this appeal. We agree, as Prosperity argued as part of its second application for a preliminary injunction that it was likely to succeed on the merits because the covenant satisfied Oklahoma's goodwill exception to the state's prohibition on covenants not to compete. We will thus consider this issue in assessing whether Prosperity has shown a substantial likelihood of prevailing on the merits.

Substantial likelihood of prevailing is the first of four factors that a party seeking an injunction must show. *See Bluefield Water Ass'n, Inc. v. City of Starkville, Miss.*, 577 F.3d 250, 252–53 (5th Cir. 2009). The other three are: irreparable injury if the injunction is not granted; that the irreparable injury outweighs any harm to the other side; and that granting the preliminary

injunction will not disserve the public interest. *Id.* We review a district court's assessment of these factors for abuse of discretion. *Id.* at 253. Conclusions of fact that affect that analysis are left undisturbed unless clearly erroneous, whereas conclusions of law are reviewed *de novo. Id.*

## III.

A legal issue—whether Texas or Oklahoma law governs the enforcement of the contract provisions—is the primary reason the district court concluded that Prosperity did not establish a substantial likelihood of prevailing on the noncompetition and nonsolicitation clauses. Because this is a diversity case, the forum state of Texas provides the law that governs this choice-of-law analysis. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *see also Atl. Marine Constr. Co., Inc. v. U.S. Dist. Court for W. Dist. of Tex.*, 134 S. Ct. 568, 582–83 (2013) (noting that although the *Klaxon* rule generally does not apply when a case is transferred to a more convenient federal forum pursuant to 28 U.S.C. § 1404(a), it does when the transfer "motion is premised on enforcement of a valid forum-selection clause").

The employment contract between Prosperity and the bankers provides that Texas law applies to "[a]ll questions concerning the validity, operation and interpretation" of the contract, as well as "the performance of the obligations imposed upon the parties." ROA.915 § 9.3. Just last year, the Supreme Court of Texas reiterated its recognition of the "party autonomy rule" by which "parties can agree to be governed by the law of another state." *Exxon Mobil Corp. v. Drennen*, 452 S.W.3d 319, 324 (Tex. 2014), *reh'g denied* (Feb. 27, 2015); *cf.* Tex. Bus. & Com. Code § 1.301(a) ("[W]hen a transaction bears a reasonable relation to this state and also to another state or nation the parties may agree that the law either of this state or of such other state or nation shall govern their rights and duties."). At first glance, one may think that principle largely ends our inquiry. We are accustomed to giving effect to the knowing and

voluntary agreement of parties, especially sophisticated ones. Agreements to arbitrate are a recurring example. *See Carter v. Countrywide Credit Indus., Inc.*, 362 F.3d 294, 297 (5th Cir. 2004) (noting strong presumption favoring enforceability of arbitration agreements). And the Supreme Court recently ruled that forum selection clauses should be enforced "'in all but the most exceptional cases.'" *Atl. Marine*, 134 S. Ct. at 581 (quoting *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 33 (1988) (Kennedy, J., concurring)). Indeed, enforcement of such a clause is why this appeal is being heard in the Fifth Circuit rather than in the Tenth, where the bankers filed suit.

Contractual choice-of-law provisions are not so unassailable. Unlike arbitration and forum selection clauses, which dictate where a dispute will be heard, choice-of-law provisions dictate the law that will decide the dispute, and thus create more tension with a state's power to regulate conduct within its borders. *See DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 677 (Tex. 1990) (explaining that judicial respect for enforcing the contractual expectations of the parties is not unlimited when it comes to choice-of-law agreements because parties "cannot by agreement thwart or offend the public policy of the state the law of which ought otherwise to apply"); *see also In re AutoNation, Inc.*, 228 S.W.3d 663, 669 (Tex. 2007) (distinguishing choice-of-law provisions from forum selection clauses because there is no "fundamental Texas policy requir[ing] that every employment dispute with a Texas resident must be litigated in Texas"); Restatement (Second) of Conflict of Laws § 187(2) cmt. g ("Fulfillment of the parties' expectations is not the only value in contract law; regard must also be had for state interests and for state regulation."). Thus, although Texas courts permit choice-of-law agreements and the default position is that they are enforceable, it is not uncommon for a party to overcome

No. 14-20682 cons w/ No. 15-20005

them.[6] *See, e.g.*, *DeSantis*, 793 S.W.2d at 681 (holding parties' choice of Florida law unenforceable and applying Texas law to enforcement of noncompetition agreement); *CMA-CGM (Am.), Inc. v. Empire Truck Lines, Inc.*, 416 S.W.3d 495, 516–17 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) (holding parties' choice of Maryland law unenforceable and applying Texas law to resident motor carrier being required to indemnify for third-party's negligence); *Panatrol Corp. v. Emerson Elec. Co.*, 163 S.W.3d 182, 186–89 (Tex. App.—San Antonio 2005, pet. denied) (holding parties' choice of Missouri law unenforceable and applying Texas law to manufacturer's indemnification of innocent seller); *cf. Ennis, Inc. v. Dunbrooke Apparel Corp.*, 427 S.W.3d 527, 534–36 (Tex. App.—Dallas 2014, no pet.) (reversing summary judgment on grounds that genuine issue of material fact remained on whether parties' contractual choice of Texas law or another state's law should apply to question of enforceability of noncompetition provision).

To render a choice-of-law provision unenforceable, a party must satisfy the standards in Section 187(2) of the Restatement (Second) of Conflict of Laws, which provides that:

> (2)  The law of the state chosen by the parties to govern their contractual rights and duties will be applied . . . unless either
>
> > (a)  the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

---

[6] The same is true in other states. *See, e.g.*, *Feeney v. Dell Inc.*, 908 N.E.2d 753, 766–67 (Mass. 2009) (holding contractual choice-of law-provision unenforceable because applying selected state's law would contravene fundamental policy of forum state); *McKee v. AT & T Corp.*, 191 P.3d 845, 852 (Wash. 2008) (en banc) (same); *Brenner v. Oppenheimer & Co. Inc.*, 44 P.3d 364, 380 (Kan. 2002) (same); *Long v. Holland Am. Line Westours, Inc.*, 26 P.3d 430, 434–35 (Alaska 2001) (same); *Cherry, Bekaert & Holland v. Brown*, 582 So. 2d 502, 507–08 (Ala. 1991) (same); *Bush v. Nat'l Sch. Studios, Inc.*, 407 N.W.2d 883, 887–88 (Wisc. 1987) (same).

(b)    application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

Restatement § 187(2)[7]; *see DeSantis*, 793 S.W.2d at 677–78 (following the Restatement framework).

The first subsection, 187(2)(a), does not help the bankers. The parties had a reasonable basis for agreeing that Texas law would apply given that Prosperity is headquartered in the state. *See Drennen*, 452 S.W.3d at 325 (stating, with respect to Section 187(2)(a), that "parties will be held to their choice when 'the state of the chosen law [has] a sufficiently close relationship to the parties and the contract to make the parties' choice reasonable.'" (quoting Restatement § 187 cmt. f)).

The analysis under subsection (b) is not so straightforward. Even when a reasonable basis exists for selecting a state as the source of law governing a transaction, the parties' selection does not control if another state: (1) has a more significant relationship with the parties and the transaction at issue than the chosen state does under Restatement § 188; (2) has a materially greater interest than the chosen state does in the enforceability of a given provision; and (3) has a fundamental policy that would be contravened by the application of the chosen state's law. *Drennen*, 452 S.W.3d at 325–27.

---

[7] Section 187 has two subsections. However, Section 187(1) is inapplicable to this case because the enforceability of restrictive covenants is generally not "'one which the parties could have resolved by an explicit provision in their agreement.'" *See DeSantis*, 793 S.W.2d at 678 (quoting Restatement § 187, cmt. d). Examples of issues that may not be resolved by an explicit provision are those involving capacity or validity. Restatement § 187, cmt. d. The parties do not dispute that Section 187(1) is inapplicable under *DeSantis* and, thus, that Section 187(2) alone directs the choice-of-law inquiry in this case.

No. 14-20682 cons w/ No. 15-20005

A.

As illustrated in *Drennen,* Texas takes the Section 187(2)(b) factors in reverse order. This makes sense as the first two inquiries do not matter unless "yes" is the answer to the last question posed—whether Oklahoma's law would provide the applicable law "in the absence of an effective choice of law by the parties." Restatement § 187(2)(b). In other words, if Oklahoma law would not apply even under an ordinary conflicts analysis without a choice-of-law provision in the mix, then there is no reason to consider whether public policy trumps the parties' agreement. Because this initial inquiry assesses whether Oklahoma law would apply in the absence of the parties' choice-of-law agreement, the "more significant relationship" test does not take account of the parties' expectation that Texas law would apply. *See Drennen,* 452 S.W.3d at 325–26 (determining the most significant contacts without taking account of the choice-of-law provision); *DeSantis,* 793 S.W.2d at 678–79 (same).

The "more significant relationship" determination is made by examining various contacts, in light of the basic choice-of-law principles enumerated in Section 6 of the Restatement.[8] *DeSantis,* 793 S.W.2d at 678. These contacts include:

---

[8] Section 6 of the Restatement enumerates the following conflict-of-laws principles for consideration:

(a)     the needs of the interstate and international systems,
(b)     the relevant policies of the forum,
(c)     the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
(d)     the protection of justified expectations,
(e)     the basic policies underlying the particular field of law,
(f)     certainty, predictability and uniformity of result, and
(g)     ease in the determination and application of the law to be applied.

(a)    the place of contracting,
(b)    the place of negotiation of the contract,
(c)    the place of performance,
(d)    the location of the subject matter of the contract, and
(e)    the domicil, residence, nationality, place of incorporation and place of business of the parties.

Restatement §188(2)[9]; *see also Minn. Mining & Mfg. Co. v. Nishika Ltd.*, 955 S.W.2d 853, 856 n.6 (Tex. 1996). These contacts are weighed "not by their number, but by their quality." *Minn. Mining*, 955 S.W.2d at 856.

Although some of the contacts favor Texas, the greater contacts—both in number and quality—favor Oklahoma. The bankers signed their agreements in Oklahoma, but the final signatures were affixed in the Lone Star State. That makes Texas the place of contracting. *See* Restatement §188, cmt. e ("[T]he place of contracting is the place where occurred the last act necessary . . . to give the contract binding effect . . . ."). It is also where Prosperity maintains its headquarters. Prosperity's home in Texas is cancelled out, however, by the bankers' residence in Oklahoma. And the remaining factors that favor Oklahoma are more than enough to overcome the execution of the contract in Texas. Most of the negotiations took place in Oklahoma. The bankers discussed the terms with F&M executives in Oklahoma and did not

---

[9] Section 188(2) says that these are the "contacts to be taken into account in applying the principles of § 6." *DeSantis* and *Drennen* appear to read this as indicating that these contacts provide a more specific application of the general Section 6 considerations in this context, and thus both addressed only the Section 188 contacts. *DeSantis*, 793 S.W.2d at 678–79 & n.2; *Drennen*, 452 S.W.3d at 326. Following those cases, both parties argue only the Section 188(2) contacts. Some intermediate Texas courts, however, have separately evaluated the Section 188(2) contacts and Section 6 factors. *See, e.g., Chesapeake Operating, Inc. v. Nabors Drilling USA, Inc.*, 94 S.W.3d 163, 170–77 (Tex. App.—Houston [14th Dist.] 2002, no pet.) (noting that in considering the expectations of the parties, the court must "put aside the parties' explicit choice of Texas law, but certainly not the rest of their contract"). Because the parties ask us to consider only the Section 188(2) factors in determining the more significant relationship, we need not consider whether the Section 6 factors should separately be considered as in *Chesapeake*, or whether *DeSantis*'s and *Drennen*'s exclusive reliance on the Section 188(2) contacts prevents us from doing so.

communicate with any Prosperity employees in Texas.  Most significant, the bankers performed all of their work for F&M (their employer for the first seven months after the agreements were signed but prior to the effective date of the merger), and most of their work for Prosperity, in Oklahoma.  Cardoni did handle six Texas accounts and managed the energy lending group in Dallas, but far more of his and the other bankers' customers were non-Texans, including Oklahomans.[10]   Indeed, the contracts twice identify Tulsa as the place of performance.  That factor, deemed to be "conclusive in determining what state's law is to apply," carried the day in two Supreme Court of Texas decisions assessing the "most significant relationship." *DeSantis*, 793 S.W.2d at 679 (citing Restatement § 196) (finding Texas to have more significant relationship than Florida when Florida employer hired Texas employee to manage Texas office, even though contract negotiations took place in Florida and employer supervised employee from Florida); *Drennen*, 452 S.W.3d at 326 (finding Texas to have more significant relationship than New York when employer and employee were Texas residents and place of performance was Texas even though employee previously worked in employer's New York office for three years).  We thus agree with the district court that Oklahoma has the more significant relationship with this case and its law would govern absent the choice-of-law provision.  *See also* Restatement § 188(3) ("If the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied . . . .").

---

[10] Prosperity points out that Texas is where loans had to be sent for approval and where computers systems used by the bankers were located.  These Texas contacts, however, are easily outweighed by the fact that Oklahoma is where the bankers maintained their offices and conducted the vast majority of their business.  *See DeSantis*, 793 S.W.2d at 679 (holding that the focus is on the "gist" of the agreement, which it found to be the plaintiff's work as the manager of the defendant's Houston office even though supervision was conducted from Florida).

No. 14-20682 cons w/ No. 15-20005

B.

To avoid application of the choice-of-law provision, the bankers must next show that Oklahoma has a materially greater interest than Texas does in the question of whether the covenants are enforceable. *DeSantis* and *Drennen* both indicate that Oklahoma has the stronger interest in this issue. In *DeSantis*, Texas and Florida shared an interest in protecting justifiable expectations of contracting parties, and Florida additionally had a "direct interest . . . [in] protecting a national business headquartered in that state." 793 S.W.2d at 679. But these were easily outweighed by Texas's interest in DeSantis as a Texas employee, in two businesses operating in Texas, and in the Texas customers which those businesses hoped to serve. *See id.* In *Drennen,* both the employee and employer were Texas residents, which gave Texas an even stronger interest in the issue affecting actors located within its borders, and left as the only countervailing consideration the uniformity and predictability that choice-of-law provisions promote. 452 S.W.3d at 326–27. It necessarily followed from *DeSantis* that Texas's even weightier interests in *Drennen* prevailed. *Id.* at 327 ("Having concluded in *DeSantis* that Texas had a materially greater interest in enforcement of the agreement than Florida when the employer at issue was Floridian*,* we must conclude that Texas has a materially greater interest than New York here, where both the employee and the employer are Texas residents." (citation omitted)).

This case, with the employees located in Oklahoma and employer based in Texas, implicates essentially the same interests as *DeSantis*, with the difference that Texas is now on the opposite side of the equation. It is Oklahoma that has the interest in the issue because of its impact on employees residing in its borders, a company (Prosperity) operating in the state, a competing bank (CrossFirst) headquartered in the state that wants the services of the employees, and the Oklahoma customers of the competing bank.

15

*See DeSantis*, 793 S.W.2d at 679 (recognizing all these as important state interests when they favored Texas). On the Texas side of the equation are the widely recognized interest in enforcing parties' contractual expectations and Texas's interest in enforcing an agreement made by a company based in the state. Given the nearly identical alignment of interests in this case and *DeSantis*—with Oklahoma taking the place of Texas in having more of the affected parties within its borders—what argument can be made for reaching a different result than the Supreme Court of Texas? Prosperity identifies a discussion in *Drennen* about Texas's evolving public policy as it relates to choice-of-law provisions:[11]

> With Texas now hosting many of the world's largest corporations, our public policy has shifted from a patriarchal one in which we valued uniform treatment of Texas employees from one employer to the next above all else, to one in which we also value the ability of a company to maintain uniformity in its employment contracts across all employees, whether the individual employees reside in Texas or New York. This prevents the "disruption of orderly employer-employee relations" within those multistate companies and avoids disruption to "competition in the marketplace."

452 S.W.3d at 329–30 (footnote omitted) (quoting *DeSantis,* 793 S.W.2d at 680). The problem for Prosperity is that at the "materially greater interest" stage in *Drennen*, this uniformity-promoting interest which was shared by both New York and Texas still lost out to the geographic-based interests of Texas alone. *Id.* at 327. Indeed, Prosperity cites no Texas case in which a state's interest in a company's maintaining uniform contracts for multistate employees has been deemed "materially greater" than a state's interest in

---

[11] *Drennen* made this pronouncement at the third step of the choice-of-law-inquiry, in determining whether applying New York law would violate fundamental Texas policy. 452 S.W.3d at 329–30. We agree with Prosperity that we can nonetheless consider it as an indication of Texas's current public policy on the importance of enforcing choice-of-law provisions that promote uniformity. But as discussed *infra*, we also have to follow how the *Drennen* court balanced this interest at the "materially greater interest" stage.

regulating conduct occurring largely within its borders.  On this *Erie* question, we are bound to follow the *DeSantis* balancing which found "little doubt" that the interests which favored Texas in that case, but favor Oklahoma here, are weightier.  793 S.W.2d at 679; *see also Drennen*, 452 S.W.3d at 327 (finding Texas's interest in the issue that affects the employer and employee residing within its borders materially greater than Texas's and New York's shared interest in "protecting the justifiable expectations" of multi-state entities).

## C.

Even though Oklahoma has the more significant relationship with the parties as well as a greater interest in whether the covenants are enforced, the parties' choice of law should stand unless application of the chosen Texas law would contravene a fundamental policy of Oklahoma.  *See DeSantis*, 793 S.W.2d at 679.  For example, even though the district court found that the first two inquiries favored Oklahoma, it concluded that application of Texas law to the nondisclosure provision was not at odds with a fundamental policy of its neighbor to the north because Oklahoma generally enforces such agreements.  But the court reached a different conclusion as to the noncompetition and nonsolicitation covenants.

Reviewing those determinations poses a challenge as neither the Supreme Court of Texas nor the Restatement has articulated a clear standard for determining when a policy is "fundamental."  *Drennen*, 452 S.W.3d at 327; *see also* Restatement § 187 cmt. g ("No detailed statement can be made of the situations where a 'fundamental' policy of the state of the otherwise applicable law will be found to exist.").  Nevertheless, these sources offer some guidance in their statement that the "application of the law of another state is not contrary to the fundamental policy of the forum merely because it leads to a different result than would obtain under the forum's law."  *DeSantis*, 793 S.W.2d at 680 (invoking Restatement § 187 cmt. g).  And *DeSantis* explains

17

that the general "focus is on whether the law in question is a part of state policy so fundamental that the courts of the state will refuse to enforce an agreement contrary to that law, despite the parties' original intentions, and even though the agreement would be enforceable in another state connected with the transaction." *Id.*; *see also Chesapeake Operating, Inc. v. Nabors Drilling USA, Inc.*, 94 S.W.3d 163, 178 (Tex. App.—Houston [14th Dist.] 2002, no pet.) ("The test is whether the chosen law contravenes a state *policy*, not the *outcome* in a particular case." (italics in original)).

Although "fundamental policy" is often an elusive concept, it can be readily determined that Oklahoma has a clear policy against enforcement of most noncompetition agreements.   Indeed, the Supreme Court of Texas has recognized that Oklahoma, along with many other states, has a fundamental policy on this issue. *DeSantis*, 793 S.W.2d at 680–81 (citing *Fort Smith Paper Co., Inc. v. Sadler Paper Co.*, 482 F. Supp. 355, 370 (E.D. Okla. 1979)); *see also Drennen*, 452 S.W.3d at 330 n.7 ("[O]ther jurisdictions have held, as we did in *DeSantis*, that the application of another state's law which results in the enforcement of a non-competition agreement contravenes the forum state's fundamental public policy." (collecting cases from multiple jurisdictions, including *Fort Smith*)).  Oklahoma's policy, though having common law origins, is today codified: "Every contract by which any one is restrained from exercising a lawful profession, trade or business of any kind, otherwise than as provided by Sections 218 and 219 of this title . . . is to that extent void."  Okla. Stat. tit. 15, § 217.    The only exceptions are noncompetition agreements for sale of goodwill and dissolution of a partnership. *See id*. §§ 218, 219.  Further indicating its antipathy to noncompetition agreements, Oklahoma law limits the ability of courts to reform unenforceable covenants. *See Bayly, Martin & Fay, Inc. v. Pickard*, 780 P.2d 1168, 1172–75 (Okla. 1989) (holding that noncompetition agreements cannot be modified judicially if essential elements

of a contract must be supplied to bring it within the rule of reason); *Loewen Grp. Acquisition Corp. v. Matthews,* 12 P.3d 977, 982 (Okla. Civ. App. 2000) (refusing to judicially modify a "fundamentally flawed" noncompetition agreement in accordance with *Bayly*). We thus agree with the district court that applying Texas law, which takes a more permissive attitude of both noncompetition agreements and the ability to reform them, would contravene Oklahoma's statutory aversion to noncompetition agreements. *See* Restatement § 187 cmt. g ("[A] fundamental policy may be embodied in a statute which makes one or more kinds of contracts illegal or which is designed to protect a person against the oppressive use of superior bargaining power.").

The district court lumped the noncompetition and nonsolicitation agreements together when it concluded that "Oklahoma has a strong interest in the application of its law because of that state's public policy concerning non-competition agreements." But the statutes governing restraints of trade that reflect Oklahoma's hostility to noncompetition agreements take a different attitude towards nonsolicitation agreements:

> A person who makes an agreement with an employer, whether in writing or verbally, not to compete with the employer after the employment relationship has been terminated, shall be permitted to engage in the same business as that conducted by the former employer or in a similar business as that conducted by the former employer as long as the former employee does not directly solicit the sale of goods, services or a combination of goods and services from the established customers of the former employer.

Okla. Stat. tit. 15 § 219A(A). The "as long as" clause of this statute, which was a 2001 amendment to the restraint of trade laws, "specifically enable[d] employers and employees to enter into non-solicitation agreements." Jeb Boatman, Note, *As Clear As Mud: The Demise of the Covenant Not to Compete in Oklahoma,* 55 OKLA. L. REV. 491, 501 (2002). This statute codified a longstanding distinction Oklahoma courts had drawn between noncompetition

and nonsolicitation clauses.  As early as 1970, the Supreme Court of Oklahoma upheld an agreement that prevented an insurance salesman from selling policies to the insureds of his former employer during the two years following his departure, noting that such an agreement "does not, in any manner or to any extent whatsoever, restrain the defendant from exercising a lawful profession, trade, or business . . . either in competition with the plaintiff or otherwise."  *Tatum v. Colonial Life & Accident Ins. Co. of Am.*, 465. P.2d 448, 451 (Okla. 1970).  *Tatum* is the beginning of a line of cases permitting nonsolicitation agreements, which led a study to conclude that "[w]hile Oklahoma courts historically have been extremely hostile to most type of employer-employee restrictive covenants, Oklahoma courts have not expressed this same hostility toward non-solicitation agreements."  Boatman, *supra*, 55 Okla. L. Rev. at 501 (citation omitted); *see id.* at 501–02 & n.95 (noting that, with one exception, "every reported case in which the Oklahoma courts have upheld a restrictive covenant as reasonable has involved a non-solicitation clause" (citing cases)).  A more recent case observes that enforcing reasonable nonsolicitation agreements actually promotes important public policy interests, as it encourages employers to hire workers without fear that the workers will be able to later lure customers away.  *See Inergy Propane, LLC v. Lundy*, 219 P.3d 547, 559–60 (Okla. Civ. App. 2008).  Oklahoma's view that most nonsolicitation agreements are lawful measures that prevent unfair competition and encourage hiring, whereas noncompetition agreements stifle competition and prohibit an employee from carrying on a trade, is not an outlier.  The new Restatement of Employment Law includes an illustration which concludes that "[b]ecause a nonsolicitation covenant would have been sufficient to address [the employer's] legitimate interests, the noncompetition

covenant is unenforceable."  Restatement of Employment Law § 8.06 cmt. c (illustration 3).

Although it did not separately assess Oklahoma's public policy concerning nonsolicitation agreements, the district court later explained in its ruling why it believed the parties' agreement not to solicit would be unenforceable under Oklahoma law.  The relevant statute allows agreements that prohibit soliciting "the established customers of the former employer." Okla. Stat. tit. 15, § 219A.  The Prosperity contract went beyond that in prohibiting the bankers from soliciting "competing business from customers *or prospective customers* of the Bank" if the banker had made contact with the customer, or had access to the customer's information, in the preceding 12 months.  ROA.910 § 6.3(c) (emphasis added).  The agreement also forbids "indirectly" soliciting Prosperity clients, *id.*, whereas the Oklahoma statute endorses only bans on "directly" soliciting goods and services, Okla. Stat. tit. 15, § 219A.  Recall, however, that applying Texas law to this nonsolicitation agreement does not violate a fundamental policy of Oklahoma law merely because applying Texas law might lead to enforcement of a clause that would be invalid under the nuances of Oklahoma law.  *See DeSantis*, 793 S.W.2d at 680 ("[A]pplication of the law of another state is not contrary to the fundamental policy of the forum merely because it leads to a different result than would obtain under the forum's law." (invoking Restatement § 187 cmt. g)).  More is needed as choice of law is going to be outcome determinative any time the parties are debating it.

We see no indication that Oklahoma's policy concerning nonsolicitation agreements rises to the level of a fundamental one that would be violated by applying the parties' chosen Texas law to the covenant.  Unlike the situation for covenants not to compete which Texas generally permits and Oklahoma forbids subject to only two exceptions, both states generally favor

nonsolicitation agreements.  Although the Oklahoma statute that reflects its policy generally favoring nonsoliciation agreements may not permit agreements that go as far as the one in this case, enforcing the parties' bargain on this issue thus does not offend Oklahoma public policy.  Notably, applying the nonsolicitation clause does not implicate the public policy concerns that underlie Oklahoma's hostile view of noncompetition agreements: the interest in allowing residents of the state to earn a living and the restraint on competition that follows when Oklahomans are not allowed to do so.  *See Tatum*, 465 P.2d at 451 (distinguishing between noncompetition and nonsolicitation provisions on the basis that the former inhibits an employee's lawful practice of his profession as well as competition, whereas the latter only prohibits the employee's use of certain special information acquired during the employee's tenure with his former employer).  Even with enforcement of the nonsoliciation clause, no doubt there remain many potential customers in the Tulsa area and elsewhere, who never had contact with Prosperity, for the bankers to solicit.  Applying Texas law to the nonsolicitation agreement thus would not offend a fundamental policy of Oklahoma law given its generally favorable treatment of such covenants.

## IV.

With respect to the noncompetition agreement for which we have concluded the choice-of-law provision likely does not govern, Prosperity does not put all its eggs in the Texas-law basket.  It argues that even if Oklahoma law applies to those clauses, then the provisions are still enforceable under the "goodwill exception" to the state's ban on noncompetition agreements.  That exception allows noncompetition covenants of limited geographic scope if entered into in connection with the sale of the goodwill of a business.  Okla. Stat. tit. 15, § 218.  Prosperity contends that because the bankers were stockholders, they held goodwill in F&M, and Prosperity purchased that

No. 14-20682 cons w/ No. 15-20005

goodwill to maintain the business's value.  The district court rejected that argument, concluding that the banker's ownership interest—a combined .39% with no individual owning more than .18% of F&M—was less than the .8% percentage deemed too "miniscule" to implicate the goodwill exception in *Bayly*, 780 P.2d at 1170.

The district court's reasoning persuades us at least that Prosperity has not shown a substantial likelihood of establishing that the noncompetition agreement qualifies for the goodwill exception, which is the extent of our review in this appeal.[12]  Oklahoma courts have applied the exception to enforce noncompetition agreements entered into by a stockholder owning 20% of a company, *see Key v. Perkins*, 46 P.2d 530, 532 (Okla. 1935)[13], and assented to by the sole operator of a veterinary practice, *Griffin v. Hunt*, 268 P.2d 874, 876–77 (Okla. 1954).  The stock ownership of the bankers in F&M was too negligible to fall within the ambit of *Key* and, although the bankers may have been important business generators, they certainly did not represent the entirety of F&M's goodwill as the *Griffin* vet did.  We are thus not persuaded that Prosperity is likely to prove that the noncompetition agreement is enforceable under Oklahoma's goodwill exception.

\* \* \*

To sum up what we have said thus far: With respect to the noncompetition covenants, the choice-of-law provision is likely unenforceable,

---

[12] It is also not clear that the bankers qualify as "one[s] who sell[] the goodwill of a business."  Okla. Stat. tit. 15, § 218.  Like all stockholders, they received cash and Prosperity stock under the merger agreement.  But the most obvious "seller" that would fit within the goodwill exception is F&M's parent company.  And the bankers' nonsolicitation agreements are not part of the merger agreement, but instead contained in separately executed contracts.  Because we are not otherwise convinced that the goodwill exception applies, however, we need not decide this question.

[13] Although the court in *Key* did not specify the percentage ownership at issue, it clarified in *Bayly* that the "appreciable amount of stock" in *Key* was 20%.  *See* 780 P.2d at 1170 n.3.

and the agreement is unlikely to fall within Oklahoma's goodwill exception to its ban on noncompetition agreements.  We thus affirm the denial of Prosperity's request for an injunction seeking to enforce these clauses because Prosperity cannot meet the important "substantial likelihood of success" factor. With respect to the nonsolicitation covenant, however, we conclude that the choice-of-law provision is likely enforceable.  On this issue, we remand to the district court to permit it to decide in the first instance, with the benefit of full briefing, whether the agreement is enforceable under Texas law as is, or pursuant to a modification, and whether the other equitable factors warrant a preliminary injunction.

## V.

This leaves the nondisclosure agreement, the one issue on which the district court concluded that it would enforce the choice-of-law provision and apply Texas law.  Although the district court concluded that the nondisclosure agreement was likely enforceable, it still denied the request for a preliminary injunction on the ground that Prosperity failed to establish likelihood of success or irreparable injury because it "only made a speculative showing that [the bankers] have disclosed or used Prosperity Bank's confidential information."

Recognizing the difficulty of undoing the district court's factual finding under the clearly erroneous standard, Prosperity argues that Texas law presumes such disclosure under the "inevitable disclosure" doctrine.  It believes some older decisions invoked that doctrine. *See FMC Corp. v. Varco Int'l, Inc.*, 677 F.2d 500, 504–05 (5th Cir. 1982) (noting that "Texas has recognized the need for injunctive relief" when, "[e]ven assuming the best of good faith," an employee who has knowledge of a former employer's manufacturing process "will have difficulty preventing his knowledge [of those trade secrets] from infiltrating his work") (relying on *Weed Eater, Inc. v.*

*Dowling*, 562 S.W.2d 898, 902 (Tex. Civ. App.—Houston [1st Dist.] 1978, writ ref'd n.r.e.)); *see also Rugen v. Interactive Bus. Sys., Inc.*, 864 S.W.2d 548, 552 (Tex. App.—Dallas 1993, no writ) (rejecting argument that failure to show misuse of confidential information prevented issuance of injunction because it was "probable that Rugen will use the information for her benefit").

The cases relied upon by Prosperity do not announce a blanket rule applicable to all nondisclosure provisions. The phrase "inevitable discovery" appears in none of them. *FMC* and *Weed Eater* involved trade secrets about manufacturing processes in which it would be next to impossible to manufacture a similar product for a competitor without using the secrets. *FMC*, 677 F.2d at 504–05; *Weed Eater*, 562 S.W.2d at 902. *Rugen* noted that it was affirming a trial court injunction finding "probable" disclosure "[u]nder these circumstances." 864 S.W.2d at 552; *see also Conley v. DSC Commc'ns Corp.*, No. 05-98-01051-CV, 1999 WL 89955, at *4 (Tex. App.—Dallas Feb. 24, 1999, no pet.) (rejecting argument that *Rugen* applied the "inevitable discovery" doctrine" and instead explaining that the decision involved a factual finding that such disclosure was "probable"). It is thus not surprising that more recent Texas case law has rejected the notion of a categorical rule. *See Cardinal Health Staffing Network, Inc. v. Bowen*, 106 S.W.3d 230, 242–43 (Tex. App.—Houston [1st Dist.] 2003, no pet.) (observing that "no Texas case expressly adopt[s] the inevitable disclosure doctrine" and holding that it need not decide whether to follow *Rugen* and *Conley*'s "modified version of the doctrine" because the employee produced evidence that "raise[d] a reasonable inference . . . that disclosure and use [of former employer's confidential information] was not probable"); *see also M-I, L.L.C. v. Stelly*, H-09-cv-01552, 2009 WL 2355498, at *7 (S.D. Tex. July 30, 2009) (stating that "inevitable disclosure" is not yet the law in Texas, and refusing to order an injunction due to lack of evidence that former employees "took any confidential information

with them or that they are using such information" at their new employers); *see also* Troy A. Martin, Comment, *The Evolution of Trade Secret Law in Texas: Is It Time to Recognize the Doctrine of Inevitable Disclosure?*, 42 S. TEX. L. REV. 1361, 1376 (2001) (concluding that "the functional premise behind the doctrine itself is clearly at odds with Texas jurisprudence" and noting that "very few courts in Texas have advanced the theory").

On this *Erie* issue, the district court thus correctly followed the best indications of prevailing Texas law and made an individualized assessment of whether disclosure had occurred or was likely to occur in this case. We do not find clear error in its conclusion and thus affirm the denial of the motion for injunctive relief.

\*\*\*

AFFIRMED IN PART; REVERSED AND REMANDED IN PART.