# Court of Appeals
## Tenth Appellate District of Texas

=====================

## 10-23-00329-CV

=====================

Jim Drew Bailey, Jr., ELD 2.0 Inc., and Taide Martina Bailey,
Appellants

v.

Mosquito Joe SPV, LLC,
Appellee

=====================

On appeal from the
170th District Court of McLennan County, Texas
Judge Jim Meyer, presiding
Trial Court Cause No. 2022-4253-4

=====================

JUSTICE SMITH delivered the opinion of the Court.

## MEMORANDUM OPINION

Jim Drew Bailey, Jr., ELD 2.0 Inc., and Taide Martina Bailey appeal from an adverse judgment rendered after a trial before the court in this breach of contract action brought by Mosquito Joe SPV, LLC. In three issues, Appellants contend the trial court erred in failing to dismiss the case, failing to apply Wisconsin law, and in finding Appellants breached the parties' agreements. We affirm.

## BACKGROUND

In September 2020, Jim and Taide Bailey entered into a franchise agreement with Mosquito Joe Franchising, LLC to open a Mosquito Joe pest control franchise in Wisconsin. The agreement provides that Texas law applies and contains a forum selection clause requiring disputes to be brought in McLennan County, Texas. Additionally, an addendum of the same date, Schedule J, states the Wisconsin Fair Dealership Law (WFDL) "will supersede any conflicting terms of the Franchise Agreement." That agreement was amended in December 2020 to replace the original "Mailer Program" with the updated "Direct Marketing Program." In December 2021, that agreement was assigned to ELD 2.0 Inc., a Texas corporation, with its principal place of business in Wisconsin. The Baileys, the principal shareholders of ELD 2.0 Inc., signed as guarantors.

The Baileys decided to purchase a second Mosquito Joe franchise territory in Wisconsin. Another franchise agreement was signed by Jim Bailey for ELD 2.0 Inc., franchisee, in December 2021. It includes an identical Schedule J addendum, but is signed by Jim Bailey for ELD 2.0 Inc., and a personal guarantee signed by Jim and Taide Bailey. Under both agreements, the franchisee was required to pay fees for Mosquito Joe's mandatory direct mail advertising program. Unsatisfied by the results of the direct mail

program and with Mosquito Joe's response to their complaints, the Baileys stopped paying the direct marketing program fees.

The parties' attempt at mediation was unsuccessful. In December 2022, Mosquito Joe filed suit in McLennan County, Texas alleging breach of contract and suit on the guaranty. In January 2023, the Baileys filed suit against Mosquito Joe in Wisconsin asserting violations of Wisconsin law. In August 2023, the Baileys filed a motion to dismiss or, in the alternative, a plea in abatement, in the Texas suit arguing that Wisconsin law applies to the case, and the case should be tried in Wisconsin. The trial court denied the motion. After a trial before the court, the court rendered judgment in favor of Mosquito Joe and ordered the Baileys to pay damages in the amount of $41,264.

## MOTION TO DISMISS

In their first issue, the Baileys assert the trial court erred in failing to dismiss this case or, in the alternative, stay the case in favor of the Wisconsin lawsuit. They argue that the addendum to the franchise agreements provides that the WFDL applies. Therefore, the trial court's failure to dismiss or stay the case offended the parties' agreement that the WFDL applies which, they argue, gives the Baileys the right to choose where to litigate this case.

Alternatively, they argue the trial court disregarded Wisconsin public policy and rendered the principles of comity meaningless by failing to dismiss

or stay this case. They urge this Court to apply the principles of comity, asserting those principles demand a Wisconsin court to determine and apply Wisconsin public policy. They argue the forum selection clause mandating suit in McLennan County is an unenforceable violation of Wisconsin public policy as expressed in the WFDL. Finally, they assert that the exceptions applicable when deciding dominant jurisdiction should apply when considering a motion to stay under comity principles.

**Standard of Review**

A trial court's ruling on a motion to dismiss is subject to an abuse of discretion standard of review. *See Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 877 (Tex. 2001); *Bowers v. Matula*, 943 S.W.2d 536, 538 (Tex. App.—Houston [1st Dist.] 1997, no writ). The scope of review is limited to those arguments raised by the motion to dismiss. *See Brown v. Aetna Cas. & Sur. Co.*, 145 S.W.2d 171, 174 (Tex. [Comm'n Op.] 1840). A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner or if it acts without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985). The reviewing court may not substitute its own judgment for the trial court's judgment. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002) (per curiam).

**Applicable Law--Choice of Law**

Which jurisdiction's laws apply to a dispute is a question of law. *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 848 (Tex. 2000). We generally honor contracting parties' bargained-for and expressed choice of which state's laws govern their performance under the contract. *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 677 (Tex. 1990) (op. on reh'g). However, parties "cannot require that their contract be governed by the law of a jurisdiction which has no relation whatever to them or their agreement. And they cannot by agreement thwart or offend the public policy of the state the law of which ought otherwise to apply." *Id.*

To determine the enforceability of a choice-of-law provision, we look to principles in the Restatement (Second) of Conflict of Laws. *Exxon Mobil Corp. v. Drennen*, 452 S.W.3d 319, 324 (Tex. 2014). Specifically, we apply Section 187(2) of the Restatement which provides:

> The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either
> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue

and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187(2) (AM. LAW INST. 1988).

Whether the Section 187(2)(b) exception applies depends on three determinations: whether a state has a more significant relationship with the parties and their transaction than the state they chose; whether that state has a materially greater interest than the chosen state in the determination of the particular issue, and whether that state's fundamental policy would be contravened by the application of the law of the chosen state. *DeSantis*, 793 S.W.2d at 678. We must enforce the parties' choice-of-law unless all three elements of this test are satisfied. *Gator Apple, LLC v. Apple Tex. Rests., Inc.*, 442 S.W.3d 521, 533 (Tex. App.—Dallas 2014, pet. denied).

**Analysis**

In their first argument under this issue, the Baileys complain that the trial court erred by failing to dismiss this case. In their Motion to Dismiss, the Baileys argued that Texas choice of law rules require the application of Wisconsin law. Both franchise agreements provided that the parties' rights under the agreements will be interpreted in accordance with the laws of the state of Texas. The Baileys assert that provision was superseded by the addendum, which provides the WFDL "will supersede any conflicting terms of

the Franchise Agreement." By denying the motion, the trial court disagreed. We apply the Restatement's analysis from the starting point that the parties chose to apply the law of Texas.

First, we determine if there is a substantial relationship between Texas and the parties or the transaction. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187(2)(a). Mosquito Joe's parent company, Dwyer Franchising, LLC's principal place of business is in McLennan County, Texas; ELD 2.0, Inc. is a Texas corporation; and Schedule A of each franchise agreement, the personal guaranty signed by the Baileys, the electronic funds transfer form identifying the Baileys' bank account, and the assignment to ELD 2.0, Inc. each provide a Texas address for the Baileys. Further, the obligations under the two promissory notes were performable in Texas. We conclude that Texas had a substantial relationship to the parties and the transaction, and section 187(2)(a) of the Restatement does not preclude the application of Texas law. *See Res. Savs. Ass'n v. Neary*, 782 S.W.2d 897, 903 (Tex. App.—Dallas 1986, writ denied) (Texas had reasonable relationship to parties and their transaction, even though real property was located in Georgia, because promisor on note was Texas partnership, promisee on note was located in Texas, indebtedness was payable at promisor's office in Texas, guarantors lived

in Texas, guarantors agreed their obligations under guaranty were performable in Texas, and parties agreed Texas law would apply to contract).

We next consider whether section 187(2)(b) of the Restatement precludes application of Texas law. Section 187(2)(b) provides that the parties' choice of Texas law is effective unless (1) Wisconsin has a more significant relationship with the parties and their transaction than Texas, (2) applying the law of Texas would contravene a fundamental policy of Wisconsin, and (3) Wisconsin has a materially greater interest in the determination of the particular issue in the case. *See Exxon Mobil Corp.*, 452 S.W.3d at 325-27; *DeSantis*, 793 S.W.2d at 678. We must enforce the parties' choice of Texas law unless all three elements of this test favor the application of Wisconsin law. *Gator Apple, LLC*, 442 S.W.3d at 533. If we conclude that one of the three inquiries favors the parties' choice of Texas law to govern their dispute, we need not examine the other two. *Id.*

Under the first factor, we consider whether the relationship of the transaction and parties to Wisconsin is clearly more significant than their relationship to the chosen state of Texas. *See DeSantis*, 793 S.W.2d at 678. In doing so, we take into account various contacts including the place of performance, contracting, and negotiations of the agreement; the location of the subject matter of the contract; and the domicile, residence, place of

incorporation, and place of business of the parties. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188(2); *Exxon Mobil Corp.*, 452 S.W.3d at 326. In conducting our analysis, we focus on which state's law has the most significant relationship to the particular substantive issue to be resolved. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188(2); *Chesapeake Operating, Inc. v. Nabors Drilling USA, Inc.*, 94 S.W.3d 163, 170-71 (Tex. App.—Houston [14th Dist.] 2002, no pet.) (op. on reh'g) (en banc).

The substantive issue to be resolved in the underlying case is whether the Baileys breached the franchise agreements by failing to pay fees owed, including direct marketing program fees. The place of contracting favors Texas. Although the Baileys seem to contend they were not residents of Texas at the time the 2020 franchise agreement was signed, the agreement contradicts that claim. Additionally, even if they were residents of Wisconsin at the time, the place of contracting is technically Texas, as the last signature was added in Texas. *Sonat Expl. Co. v. Cudd Pressure Control, Inc.*, 271 S.W.3d 228, 233 (Tex. 2008). Further, the 2021 franchise agreement specifically states that the execution and acceptance of terms occurred in Texas. The record does not indicate where negotiations took place, but this factor is of less importance when the parties conduct their negotiation from

separate states, which may have been the case regarding the 2020 agreement. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188 cmt. e.

The place of performance favors Texas. The 2021 franchise agreement provides that the performance of material obligations arising under the agreement, including the franchisee's payment of monies due and satisfaction of certain training requirements, shall occur in Texas. Both promissory notes, one for each franchise agreement, provide that "[a]ll indebtedness is payable and all obligations are performable in Waco, McLennan County, Texas." Mosquito Joe's place of business is in Texas while the Baileys' place of business is in Wisconsin, although they apparently operate it from Texas. The location of the subject matter of the franchise agreements is arguably Wisconsin, where the Baileys opened a franchise. However, the conduct at issue is the Baileys' failure to pay for the direct marketing program which, according to the franchise agreements, is to be completed electronically and, as a material obligation under the agreement, shall occur in Texas.

While the transaction and parties bear relations to both states, considering the factors named in Section 188, we conclude that the relationship of the transaction and parties to Texas is more significant than their relationship to Wisconsin. *See Drennen*, 452 S.W.3d at 326. Accordingly, we

need not address the other two factors.  *See Gator Apple, LLC*, 442 S.W.3d at 533.

We conclude that the choice of law principles as stated in the Restatement require the parties' choice of law provisions in the agreements, to apply Texas law, must be upheld.  *See DeSantis*, 793 S.W.2d at 677.  The trial court did not err in denying the Baileys' motion to dismiss on the basis of choice of law principles.

The Baileys argue in the alternative that the trial court erred in denying their motion based on the principles of comity.  Comity is a principle of mutual convenience whereby one state or jurisdiction will give effect to the laws and judicial decisions of another.  *In re AutoNation, Inc.*, 228 S.W.3d 663, 670 (Tex. 2007) (orig. proceeding).  When a matter is first filed in another state, the general rule in applying comity is that, under certain circumstances, Texas courts stay the later-filed proceeding pending adjudication of the first suit.  *Id*. However, besides the fact that this Texas suit was filed before the Wisconsin suit, the Baileys did not raise comity in their motion to dismiss.  In the "Plea in Abatement" portion of their motion to dismiss, they asserted, "[i]n the alternative, should the Court deny Defendants' Motion to Dismiss, Defendants bring this, its Plea in Abatement, requesting that this Court abate this current matter and allow the case in Wisconsin to continue because the Wisconsin Case

is the court of dominant jurisdiction." Dominant jurisdiction applies to suits filed in different courts within Texas; the doctrine does not apply to suits filed in other states. *Ashton Grove L.C. v. Jackson Walker L.L.P.*, 366 S.W.3d 790, 794 (Tex. App.—Dallas 2012, no pet.).

To preserve error, a complaint on appeal must comport with the objection made at trial. TEX. R. APP. P. 33.1(a); *Martin v. Cottonwood Creek Constr., LLC*, 560 S.W.3d 759, 763 (Tex. App.—Waco 2018, no pet.). The Baileys' complaint that the trial court erred in denying their motion based on comity is waived because they raised a different complaint in their motion to dismiss. *Id*. We overrule the Baileys' first issue.

## APPLICATION OF WISCONSIN LAW

In their second issue, the Baileys contend the trial court erred by failing to apply Wisconsin law to the dispute. They present extensive arguments regarding choice of law analysis. They end their discussion by stating "this case must be judged by Wisconsin law, not Texas law, and the trial court erred in applying Texas law to the parties' substantive claims, resulting in an improper judgment against the Bailey parties."

Mosquito Joe asserts that the Baileys failed to preserve this issue by failing to file a Rule 202 motion requesting the court to take judicial notice of Wisconsin law. In their reply brief, the Baileys explained that they impliedly

requested the trial court to take judicial notice of Wisconsin law in their motion to dismiss, and the trial court impliedly took notice of Wisconsin law and refused to apply such law by denying the Baileys' motion.

Under Rule of Evidence 202, a party may compel a trial court to take judicial notice of another state's law by filing a motion, giving notice to other parties, and furnishing the court with sufficient information to enable it to properly comply with the request. TEX. R. EVID. 202. If a party does not ask the trial court to take judicial notice of the law of another jurisdiction or fails to provide adequate proof of the content of that law, the law of that jurisdiction will be presumed to be the same as Texas law. *See Burlington N. & Santa Fe Ry. Co. v. Gunderson, Inc.*, 235 S.W.3d 287, 290 (Tex. App.—Fort Worth 2007, pet. withdrawn). A preliminary motion is necessary to assure the application of the law of another jurisdiction, and absent a motion by a party, Texas law may be applied to a dispute. *Id.*

In their motion to dismiss, the Baileys asked the court to dismiss or abate the Texas lawsuit to allow their Wisconsin lawsuit to proceed. The relief requested in the pretrial motion to dismiss is not a request to apply Wisconsin law in the Texas lawsuit. The Baileys did not comply with Rule 202. Therefore, the trial court did not err in applying Texas law. *See id.* We overrule the Baileys' second issue.

In their third issue, the Baileys contend that the franchise agreements are unenforceable, therefore the trial court erred by holding that they breached the parties' agreements. They further argue that they were relieved of their obligation due to Mosquito Joe's prior material breach.

## Unconscionability

The Baileys assert that the agreements were procedurally and substantively unconscionable. Unconscionable contracts are unenforceable under Texas law. *See In re Poly-America, L.P.*, 262 S.W.3d 337, 348 (Tex. 2008) (orig. proceeding). The ultimate question of unconscionability of a contract is one of law, to be decided by the court. *Id.* at 349. We apply a de novo standard of review in determining whether a contract is unconscionable. *Delfingen US-Tex., L.P. v. Valenzuela*, 407 S.W.3d 791, 798 (Tex. App.—El Paso 2013, no pet.). The burden of proving unconscionability falls on the party opposing the contract. *In re Poly-America, L.P.*, 262 S.W.3d at 348.

### *Procedural Unconscionability*

In their first argument under this issue, the Baileys assert that the direct mailer provisions of the agreements were procedurally unconscionable because the negotiation process was unfair. They assert that Mosquito Joe took advantage of them by falsely representing that the marketing program

was designed to generate leads for the Baileys' franchise when the true purpose was to spread brand awareness. Further, they contend Mosquito Joe, the party with superior knowledge, acted unethically and deceived them by eliminating any potential liability or obligation on Mosquito Joe's part regarding the direct marketing program. The Baileys also complain that, while they had "disparate bargaining power and financial ability," they were required to participate in the direct marketing program. Although the circumstances under which the 2020 and 2021 agreements were formed were not identical, the Baileys do not try to make separate arguments regarding unconscionability of the two different agreements.

Procedural unconscionability refers to the circumstances surrounding the formation of the contract. *In re Halliburton Co.*, 80 S.W.3d 566, 571 (Tex. 2002) (orig. proceeding). The principles of unconscionability do not negate a bargain because one party to the agreement may have been in a less advantageous bargaining position. *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 757 (Tex. 2001) (orig. proceeding). In determining whether a contract is unconscionable, we must examine (1) the "entire atmosphere" in which the agreement was made; (2) the alternatives, if any, available to the parties at the time the contract was made; (3) the "non-bargaining ability" of one party; (4)

whether the contract was illegal or against public policy; and (5) whether the contract is oppressive or unreasonable. *Delfingen*, 407 S.W.3d at 798.

Jim Bailey testified that he holds a Masters in Business Administration from the University of Houston and worked for Shell Oil Company for twenty years as a director of supplier quality. He also holds a "Six Sigma Black Belt Certification," specialized training through which he learned to help organizations improve their processes and implement controls. He explained that he researched business opportunities for his retirement years. Considering mosquito control as a possible opportunity, he looked at Mosquito Joe and two competitors. Mosquito Joe was the only one that would take care of marketing for the franchisee. Knowing Mosquito Joe would handle that part of his business so he could focus on other areas of the business made it easier to choose Mosquito Joe.

Amy Yemm, Mosquito Joe's vice-president of operations and past direct marketing director, testified that, after signing the first franchise agreement, the Baileys were provided training materials, including a document which explained that their program was not just a direct mail program, but also a brand awareness program. Yemm indicated that the document clearly states there is no guarantee of benefits. Yemm explained the contents of Exhibit 6, the "training deck" presented to franchisees during "business training week."

Training is required, after franchise agreements are signed and before they begin operations, to educate franchisees on the direct marketing program. Under the heading "5 Reasons Direct Mail Works" is the statement that it builds brand awareness. Although the Baileys did not have the training information at the time they signed the first franchise agreement, they had it before they signed the second franchise agreement.

The franchise agreements required each franchisee to agree to abide by all of Mosquito Joe's marketing and advertising requirements. The 2020 franchise agreement stated that the franchisee is required to send postcards to each targeted household in the territory as prescribed by Mosquito Joe. The 2021 agreement specified that the franchisee "must participate in our direct marketing program providing direct mail, digital display, social media and digital and other marketing, promotional and advertising programs and related services (the 'Direct Marketing Program') and pay us or our affiliate the Direct Marketing Program Fees" as required by the agreement. Further, the franchisee must spend the minimum amounts set forth in the Data Sheet, Appendix A to the agreement, on approved local marketing and promotion in the territory each year. The 2020 and 2021 Data Sheets provide that the annual minimum local marketing requirement is the greater of $35,000 and 8 percent of the prior year's gross sales. The 2020 Data Sheet specifically states

that this requirement includes the Mailer Program Fees. The 2021 Data Sheet, Appendix A to the 2021 franchise agreement, states that the annual minimum local marketing requirement includes the Direct Marketing Program Fees. In the 2021 agreement, direct mail is a component of the Direct Marketing Program. The 2020 Data Sheet states that there are 34,524 targeted households in the Baileys' original territory. The 2021 Data Sheet states the number of targeted households was 34,987. The franchise agreements are silent as to Mosquito Joe's requirements, if any, to ensure deliverance of a certain percentage of the mailers.

The agreements identify what Mosquito Joe calls a Marketing, Advertising and Promotion Fund (the MAP Fund). Franchisees pay into the MAP Fund and Mosquito Joe uses disbursements from the MAP Fund for expenses incurred in connection with the cost of formulating, developing, implementing, and administering marketing, advertising, public relations, and promotional campaigns. Paragraph 7A of the 2020 and 2021 franchise agreements provides:

> We assume no direct or indirect liability or obligation to you with respect to collecting amounts due to the MAP fund or related to our maintenance, direction or administration of the MAP fund, including with respect to the efficiency or effectiveness, if any, of the MAP fund in enhancing the Marks, brand or System or advancing the business interests of a franchisee or franchisees in general.

Although the MAP Fund, designed to pay marketing expenses, apparently excludes Mailer Program Fees, we find it indicative of Mosquito Joe's position regarding Mosquito Joe's potential liability as to the direct marketing program. Payment of the MAP fee and the direct mail program fee were mandatory. Mosquito Joe's express denial of liability with respect to the effectiveness of the MAP fund, which was maintained by Mosquito Joe, is consistent with its implicit denial of liability for the effectiveness of the direct mailer provisions, which Mosquito Joe did not handle or control.

The franchise agreements were premised on the fact that Mosquito Joe Franchising, LLC had "developed a system for establishing and operating businesses identified by the MOSQUITO JOE service mark and engaged in controlling undesirable outdoor insects . . . pursuant to certain standards and specifications." Further, the franchise agreements contained provisions indicating Mosquito Joe intended to protect its brand while allowing franchisees to use it. The agreements stated that Mosquito Joe owns the marks and the goodwill of the business. The agreements provided: "Your use of the Marks will inure to our benefit." Franchisees may use the marks only as authorized by Mosquito Joe. The franchisees "must implement and abide by [Mosquito Joe's] requirements and recommendations directed to enhancing substantial System uniformity." In the interest of protecting the Mosquito Joe

brand, marks and the System, Mosquito Joe reserved the right to determine the response to a crisis, which it defined as an event that negatively impacts the Mosquito Joe brand. In Schedule D of the franchise agreements, the Baileys acknowledged that any training or tools provided by Mosquito Joe are for the purpose of protecting the MOSQUITO JOE brand and marks and to assist them in the operation of their business.

These provisions are indicative of the atmosphere in which the agreements were made. In order to expand its business, Mosquito Joe was willing to grant a franchise to operate a Mosquito Joe business subject to the limiting conditions in the agreement. Mosquito Joe made its position clear. Mosquito Joe provided the brand, expertise, business model, and goodwill. The franchisee, if it wanted to obtain a franchise, had to agree to the marketing program. The absence of a provision requiring Mosquito Joe to maintain liability for the direct mail program cannot be considered unethical or deceptive.

Neither are we persuaded that the Baileys' bargaining power and financial ability led to a procedurally unconscionable agreement. Jim Bailey, the holder of an advanced business degree with two decades of experience working for a large corporation, researched business opportunities, including Mosquito Joe and, specifically, direct mail programs. The Baileys are

presumed to have knowledge of and understand the contents of the written agreements they signed. *See In re Bank One, N.A.*, 216 S.W.3d 825, 826 (Tex. 2007) (orig. proceeding) (per curiam). The Baileys could have chosen a different mosquito control company as their retirement business opportunity, one that left marketing to the franchisee. Considering the circumstances surrounding the formation of the agreements, the Baileys have not proven the direct mailer provisions of the franchise agreements were procedurally unconscionable. *See In re Halliburton Co.,* 80 S.W.3d at 571.

*Substantive Unconscionability*

In their second argument under the third issue, the Baileys assert that the direct marketing program provisions were substantively unconscionable. Specifically, they contend that the program is utterly lopsided because it forced franchisees to participate in the program, and pay an exorbitant amount for it, while creating no obligation or liability in exchange on the part of Mosquito Joe. Alternatively, the Baileys argue that the requirement that the Baileys must pay for mailers to be sent to 100 percent of the households in their territories while Mosquito Joe must only mail 90 percent is substantively unconscionable and utterly lopsided.

Substantive unconscionability refers to the fairness of the contract itself. *Id.* A contract is substantively unconscionable if, given the parties' general

commercial background and the commercial needs of the particular trade or case, the clause involved is so one-sided that it is unconscionable under the circumstances existing when the parties made the contract. *In re Olshan Found. Repair Co., LLC,* 328 S.W.3d 883, 892 (Tex. 2010) (orig. proceeding); *In re Poly-America, L.P.,* 262 S.W.3d at 348. Unconscionability is to be determined in light of a variety of factors, which aim to prevent oppression and unfair surprise; in general, a contract will be found unconscionable if it is grossly one-sided. *In re Poly-America, L.P.,* 262 S.W.3d at 348. An unconscionable contract is so one-sided, with so gross a disparity in the values exchanged, that no rational contracting party would have entered the contract. *In re Olshan Found. Repair Co., LLC.,* 328 S.W.3d at 892.

Contrary to the Baileys' argument, the franchise agreements created obligations for Mosquito Joe. Pursuant to their agreements, Mosquito Joe was responsible for creating, implementing, and administering a marketing program that included the direct mail program, as well as other marketing tactics. Further, Mosquito Joe was required to obtain a mailing list of targeted households and contract with a third-party vendor to print and mail the postcards. Mosquito Joe provided marketing, including direct mail, to all of its franchisees, fronting costs. While not set out with specificity in the franchise agreements, Mosquito Joe retained responsibility for mailing the postcards.

However, that is necessarily done in conjunction with the United States Postal Service. *See Rosenthal v. Walker*, 111 U.S. 185, 193 (1884) (Held that, where mail is delivered to the postman, the presumption that it reached its destination and was received by the person to whom it was addressed is an inference of fact founded on the probability that the officers of the government will do their duty and the usual course of business.).

The franchise agreements set out in detail the Baileys' responsibilities regarding the mailer program. The agreements explained that the Baileys must pay to Mosquito Joe what was called Mailer Program fees in 2020 and what was called Direct Marketing Program fees in 2021, and the agreements set out when those were due and that the fees were nonrefundable. The amounts and types of fees associated with the direct mailer program were specified in Schedule A, entitled "Data Sheet." Jim Bailey holds an advanced business degree and has two decades of experience in business. The Baileys are presumed to have an understanding of the documents they signed. *See In re Bank One, N.A.*, 216 S.W.3d at 826. Under these circumstances, the direct marketing program provisions, or mailer program provisions, are not so one-sided as to make the agreements substantively unconscionable. *See In re Olshan Found. Repair Co., L.L.C.*, 328 S.W.3d at 892; *In re Poly-America, L.P.*, 262 S.W.3d at 348.

Additionally, we are not persuaded by the Baileys' alternative argument that the agreements were unconscionable because the Baileys were required to pay for the total amount of postcards to be mailed on their behalf while Mosquito Joe's practices did not require a showing that 100 percent of the postcards were actually mailed.

Mosquito Joe contracted with a third-party vendor to create and address the postcards. That vendor shipped the postcards to the United States Postal Service. In processing the postcards, the post office scanned them. The scanning information was sent to the third-party vendor. That vendor created a percentage-scanned report showing the scan rate and emailed it to Mosquito Joe. The scan rate refers to the percentage of the total number of mailers delivered to the post office that were scanned at the post office. Mosquito Joe considered a 90 percent scan rate to mean that 100 percent of the postcards were delivered to prospective customers. Pursuant to its policy, if the number scanned dropped below 90 percent of the number delivered to the post office, Mosquito Joe instituted a review. Yemm explained that sometimes the cards were not scanned because of smeared ink or because they were stuck together.

The number of mailers the Baileys are required to pay for, and the number of mail pieces scanned, are not congruent or comparable categories. The Baileys were contractually obligated to pay for 100 percent of the mailers

as part of a marketing program to obtain customers for their business. How Mosquito Joe measured success regarding its attempt to track the postcards after delivery to the post office, by looking at the number of cards scanned, is not a contractual obligation. It is just an internal business practice. Requiring the Baileys to pay for 100 percent of the postcards mailed on their behalf while not requiring Mosquito Joe to prove all 100 percent were mailed does not make the franchise agreements substantively unconscionable. *See In re Halliburton Co.*, 80 S.W.3d at 571. The Baileys have not proven the direct marketing program provisions were substantively unconscionable. *See In re Poly-America, L.P.*, 262 S.W.3d at 348.

**Mosquito Joe's Performance**

In their third argument under the third issue, the Baileys contend that Mosquito Joe failed to perform as required by the agreements. They assert that Mosquito Joe "failed to mail the mailers required under the Marketing Program the parties agreed upon." Specifically, they complain that Mosquito Joe failed to show whether the mailers were actually sent. They allege there are no source documents showing the mailers were printed, paid for, or transmitted to the post office, as required by the marketing program. Asserting that approximately 4,000 mailers were missing from the scans, they

argue there is no indication that Mosquito Joe sent the 127,000 postcards the Baileys ordered.

Further, the Baileys assert that Mosquito Joe's behavior fails to comport with the standard of good faith and fair dealing. They contend Mosquito Joe did not comply with its policy of investigating why less than 90 percent of postcards were scanned by the post office in five different zip codes, and did not provide the Baileys with the option of sending the postcards, getting a refund, or using the funds for another type of marketing. Because Mosquito Joe failed to send at least thousands of postcards, the argument continues, the Baileys were relieved of their obligation to pay the remaining amount for the direct marketing program.

**Standard of Review**

In an appeal of a judgment rendered after a bench trial, the trial court's findings of fact have the same weight as a jury's verdict, and we review the legal and factual sufficiency of the evidence used to support them just as we would review a jury's findings. *In re Doe*, 19 S.W.3d 249, 253 (Tex. 2000); *Anderson v. Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991). We review the trial court's conclusions of law de novo; that is, we review the trial court's legal conclusions drawn from the facts to determine their correctness. *See BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002).

A party attacking the legal sufficiency of the evidence supporting an adverse finding on an issue on which the party bore the burden of proof must demonstrate all vital facts in support of the issue were established as a matter of law. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (per curiam). The analysis requires that we first examine the record in the light most favorable to the verdict for some evidence supporting the finding, crediting evidence favoring the finding if a reasonable fact finder could and disregarding contrary evidence unless a reasonable fact finder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 822 (Tex. 2005). We must indulge every reasonable inference that would support the verdict. *Id.* at 822. Some evidence, meaning more than a scintilla, exists when the evidence supporting the finding "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997). If there is no evidence supporting the finding, the reviewing court will then examine the entire record to determine if the contrary proposition is established as a matter of law. *Francis*, 46 S.W.3d at 241. The issue should be sustained only if the contrary proposition is conclusively established. *Id.*

When considering a factual sufficiency challenge, we consider and weigh all of the evidence. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986).

An appellant attacking factual sufficiency with respect to an adverse finding on which he had the burden of proof must demonstrate that the finding is against the great weight and preponderance of the evidence. *Francis*, 46 S.W.3d at 242. We may set aside the finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Pool*, 715 S.W.2d at 635.

Whether reviewing legal or factual sufficiency, we may not substitute our judgment for that of the trier of fact or pass on the credibility of the witnesses. *See Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998). In a bench trial, the trial court may resolve any inconsistencies in the testimony as well as determine the weight of the evidence. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986).

**Applicable Law**

When one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance. *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 196 (Tex. 2004) (per curiam). The contention that a party is excused from its contract performance by the other party's prior material breach is an affirmative defense. *Henry v. Masson*, 333 S.W.3d 825, 834 (Tex. App.—Houston [1st Dist.] 2010, no pet.). The Baileys bore the burden to prove their affirmative defense of a prior

material breach.  *See Compass Bank v. MFP Fin. Servs., Inc.*, 152 S.W.3d 844, 851-52 (Tex. App.—Dallas 2005, pet. denied).

**Discussion**

The Baileys pleaded the affirmative defense of prior breach by Mosquito Joe.  The trial court found that Mosquito Joe fully performed or tendered performance under all agreements between the parties, implicitly finding against the Baileys on their affirmative defense.  The evidence supports this finding.

While the Baileys were required to participate and send cards to a predetermined number of prospective customers, the agreements did not specify any requirements for mailing the cards or ensuring delivery, nor did they identify acts or measures related to the direct mail program that constitute compliance on the part of Mosquito Joe.  Pursuant to its contractual obligation to implement and administer a marketing program, Mosquito Joe arranged for the appropriate number of postcards to be printed and mailed to households in the Baileys' territories.  The print vendor who was responsible for delivering the postcards by pallet to the post office, shipped a total of 69,948 postcards to the post office in 2021 and 127,083 in 2022.

The post office scanned the bar codes on each individual piece of mail.  This information was entered into a tracking software system.  Based on that

data, and the number of cards delivered to the post office, the third-party vendor calculated the percentage of mail pieces scanned. Mosquito Joe reviewed the post office scans and third-party reports to monitor the mailer card system. Mosquito Joe accepted a showing that 90 percent had been scanned at the post office as proof that all or most mail pieces had been delivered to households. In 2022, there were five zip codes in which the scans did not meet the 90 percent threshold. However, the total average scan rate of all the zip codes was 97 percent.

While Mosquito Joe has access to reports showing how many postcards were delivered to and scanned by the post office, there is no way to determine how many postcards were actually delivered to potential customers. Transporting the postcards from the post office to individual households was beyond Mosquito Joe's contractual responsibility or control. *See Ward v. Charter Oak Fire Ins. Co.*, 579 S.W.2d 909, 910-11 (Tex. 1979) (party should not be denied her day in court because of a post office mistake beyond her control); *Fort Bend Cent. Appraisal Dist. v. Am. Furniture Warehouse Co.*, 630 S.W.3d 530, 537 (Tex. App.—Houston [1st Dist.] 2021, no pet.) (delivery of mail is the USPS's essential activity); *Travelers Ins. Co. v. Johnson*, 131 S.W.2d 242, 244-45 (Tex. Civ. App.—Beaumont 1939, writ dism'd, judgmt. cor.) (persons mailing notice have a right to expect notice will be transmitted by the postal

authorities and delivered to and received by addressee in due course of the mail); *see also* TEX. R. CIV. P. 21a (service by mail is complete upon deposit of the document, postpaid and properly addressed, in the mail).

Again, the agreements did not specify Mosquito Joe's precise obligations regarding the mailers and did not require it to show mailers, or a certain number or percentage, were actually sent. Mosquito Joe arranged for the postcards to be delivered to the post office. At that point, distributing the postcards became the post office's responsibility. The Baileys did not meet their burden to prove Mosquito Joe committed a prior breach. *See Francis*, 46 S.W.3d at 241; *Compass Bank*, 152 S.W.3d at 851-52. Considering the evidence in the light most favorable to the verdict, crediting evidence favoring the finding if a reasonable fact finder could, we conclude that there is legally sufficient evidence to support the court's finding that Mosquito Joe did not breach the franchise agreements. *See Wilson*, 168 S.W.3d at 822; *Francis*, 46 S.W.3d at 241.

We turn now to the question of the factual sufficiency of that finding. Jim Bailey testified that he did not believe that he received what was contracted to be provided. He saw nothing that showed him Mosquito Joe actually mailed 127,000 mailers in his territory. He testified that: "My position is they did not send 127,000. My position is I have no idea how many they

sent. And based on my repeated requests to have some type of documentation to show that they had, and their failure to do so, I'm of the opinion that they only made a few of them based on the response rate." Additionally, he did not accept as true the information in Mosquito Joe's spreadsheets. He wanted to see what he referred to as "source documents" in order to verify the data in the spreadsheets. He stated that he has "no clue if those numbers are accurate or not." While Mosquito Joe verified that pallets had reached the designated intake center, he asserted that does not indicate what was on the pallets.

In essence, the Baileys presented testimony asserting that Mosquito Joe did not prove it sent out 100 percent of the mailers. However, the Baileys presented mere conjecture. The evidence shows that postcards were delivered to the post office. In light of the fact Mosquito Joe is not responsible for the post office's duties, the Baileys did not present evidence that Mosquito Joe did not comply with its contractual responsibility to implement and administer the direct mail program.

Considering all the evidence, the Baileys have not shown that the trial court's finding that Mosquito Joe did not breach the franchise agreements is against the great weight and preponderance of the evidence. *See Francis*, 46 S.W.3d at 242. The Baileys did not meet their burden to prove their affirmative defense of prior breach. *See Compass Bank*, 152 S.W.3d at 851-52.

Further, even if the evidence supported a finding that Mosquito Joe breached the agreements, the Baileys could not recover on their affirmative defense. The Baileys stopped paying toward marketing in the summer of 2022, but intended to resume payment after Mosquito Joe provided the requested proof that the postcards were mailed. The parties corresponded about these issues into September. Thus, after the Baileys came to believe Mosquito Joe had breached their agreements, the Baileys treated the agreements as continuing, expecting to pay what they owed after Mosquito Joe provided evidence that they mailed the postcards, and then to continue operating their franchise. When a party treats a contract as continuing despite the other party's prior breach, the party may not rely on prior material breach to excuse his own performance. *See Long Trusts v. Griffin*, 222 S.W.3d 412, 415-16 (Tex. 2006) (per curiam).

The Baileys also assert that Mosquito Joe's "behavior fails to comport with the standard of good faith and fair dealing." They complain about Mosquito Joe's actions but do not identify any applicable standard of good faith and fair dealing. Texas does not recognize a common law contract claim premised on breach of an implied covenant of good faith and fair dealing. *See Arnold v. Nat'l Cty. Mut. Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex. 1987). The supreme court has recognized that a duty of good faith and fair dealing may

arise as a result of a special relationship between the parties governed or created by a contract. *Id*. The franchisor-franchisee relationship does not amount to a "special relationship" giving rise to heightened duties. *See Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 596 (Tex. 1992) (op. on reh'g). The supreme court has declined to extend this common-law duty to all franchise agreements. *Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 225 (Tex. 2002). Therefore, there is no merit in the Baileys' assertion that Mosquito Joe's behavior fails to comport with the standard of good faith and fair dealing. *Id*.

The franchise agreements are neither procedurally unconscionable nor substantively unconscionable. Further, the evidence is legally and factually sufficient to support the trial court's implied finding that the Baileys did not prove their affirmative defense of prior material breach. Therefore, the franchise agreements were not unenforceable, and the trial court did not err in holding the Baileys' breached the parties' agreements. Accordingly, we overrule the Baileys' third issue.

## CONCLUSION

The trial court did not err in denying the Baileys' motion to dismiss or in applying Texas law. The franchise agreements are not procedurally or substantively unconscionable. The trial court did not err in finding that

Mosquito Joe did not breach the agreements or by implicitly finding the Baileys did not meet their burden to prove the affirmative defense of prior material breach.

We affirm the trial court's judgment.

_____

STEVE SMITH
Justice

OPINION DELIVERED and FILED: April 10, 2025

Before Chief Justice Johnson,
      Justice Smith, and
      Justice Harris
Affirmed
CV06

